WELCH, Judge.
James Earl Walker, an inmate on death row at Holman Correctional Facility, appeals the Houston Circuit Court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In August 2003, Walker was convicted o.f murdering 87-year-old Bessie Lee Thweatt during the course of a burglary, an offense defined as capital by § 13A-5-40(a)(4), Ala.Code 1975. The jury unanimously recommended, that Walker be sentenced to death. The circuit court followed thé jury’s recommendation - and sentenced Walker to death. On direct appeal, this Court initially remanded the case to the circuit court for that court to correct its sentencing order. See Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004). On return to remand, we affirmed Walker’s conviction and sentence of death. See Walker v. State, 932 So.2d at 160 (opinion on return to remand). The *261 Alabama Supreme. Court affirmed- this Court’s judgment. See Ex parte Walker, 972 So.2d 737 (Ala.2007). On May 21, 2007, this Court issued a certificate of judgment, thereby making our judgment as to Walker’s direct appeal final. See Rule 41, Ala. R.App. P.
In May 2008, Walker filed a timely petition for postconviction relief. Walker filed amended petitions in July 2008 (C. 165), February 2009 (C. 752), December 2009 (C. 1326), and March 2010 (C. 1587). In December 2008 and June 2009, the circuit court summarily dismissed some of Walker’s claims. In January 2010, an eviden-tiary hearing was held on- the remaining claims. In August 2011, the circuit court .issued a 34-page order denying Walker’s postconviction petition. Walker filed a timely notice of appeal to this Court.
In its order denying Walker’s postcon-viction petition, the circuit court set out the following facts surrounding the murder:
“The victim, Bessie Lee Thweatt, was at home on the night of January 5, 2000. The 87-year-old woman lived in the same house in Houston County, Alabama, for the past 67 years. She was petite in stature and weighed approximately 112 pounds. She was known to keep money inside the home and her vehicle. On that fateful night, [Rex] Beckworth and stepbrother, James Earl Walker appeared at the Thweatt home. The outside carport light was broken and the phone lines to the house were cut. The assailant broke the back window and entered the home. Mrs. Thweatt’s blood soaked body was later discovered inside her -home, which had been ransacked. She was pronounced dead at the scene.
“After the murder, Walker and Beck-worth went to Motel 6 where Walker’s sister worked, . Beckworth was driving Walker’s .vehicle,- She (Walker’s sister) rented a room to them in-her name at Walker’s request. She saw a .22 caliber rifle in the trunk. A hunter found a .22 caliber semi-automatic rifle in the creek at Power Dam. Road. He called the Houston County, Sheriffs department and helped retrieve the gun from the water. A state forensic firearm examiner determined that bullet fragments taken from the Thweatt home were..22 caliber. .However, the bullets were damaged and the .firearm expert could not form an opinion as to a match, although he indicated they were similar. A .22 caliber easing was found at the Thweatt home. The firearm examiner . determined that this casing was fired from the .22 caliber rifle pulled from the creek. ■ .
“Houston County Sheriffs department investigators focused their attention on Walker and Beckworth. They were known to be living in Etowah County, Alabama... Ron Jones, an officer with the Hokes. Bluff police department, knew both Defendants. Providing assistance to the Houston County Sheriffs department, Officer Jones ■ went to [Walker’s] mobile home in June 2000. Defendant Beckworth ran out the door ,and Defendant Walker hid underneath the love seat in a fetal position. Officer Jones took Walker into custody. .
“Once Walker was-returned to Houston County from Etowah-County he-took investigators to the scene of the crime. On video he explained how the two approached the house and that Beckworth broke the. rear window and entered the home through that window. He claimed that he never entered the home .and later ran from the area when he heard a gun shot. However, a jail inmate, Tim Byrd, testified that Walker admitted to him that he (Walker) had done the kill *262 ing. Byrd stated that Walker wanted to clear his conscience.
• “Dr. Alfredo- Parades, a forensic pathologist performed the autopsy on Mrs. Thweatt. Dr. Parades found that the victim was shot at close range due to gunpowder residue on’her face. He also noted there were" numerous lacerations on the face and three fractures to the cheek. There were a total of nine injuries from blunt fobce trauma, which included two fractures of the skull. Dr. Parades opined that the victim was alive during the blunt force trauma injuries and these injuries preceded the gunshot wound to the head. The gunshot wound caused the victim’s death. Dr. Parades also testified that Mrs. Thweatt suffered pain.
“The Defense produced four witnesses!!;] perhaps the most important was Mark Peacock who was the victim’s grandson. He testified that he knew co-defendant Beckworth from his days as an inmate at Clio. They were incarcerated at the same place. There were, discussions between them about Mrs. Thweatt keeping money at her home.”
(C. 2276-78.)

.Standards of Review

Walker appeals the circuit court’s denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P..According to Rule 32.3, Ala. R.Crim. P., “[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
“Though we reviewed the claims on [Walker’s] direct appeal for plain error, the plain-error standard of review does not apply to a postconviction petition attacking a capital-murder conviction and death sentence. See Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App. 2008); Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007); Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007); Gaddy v. State, 952 So.2d 1149 (Ala.Crim.App.2006).. ‘In addition, “[t]he procedural bars of Rule 32 apply with equal force to •all cases, including those in which the death penalty has been imposed.” ’ Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).. When reviewing the circuit court’s rulings on the claims raised in [Walker’s] postconviction petition, we apply an abuse-of-discretion standard. Gaddy, 952 So.2d at 1154.”
Ray v. State, 80 So.3d 965, 971 (Ala.Crim.App.2011). “:[W]hen . the facts are undisputed and an appellate court is presented with pure questions of law, [this Court’s] review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala. 2001). “[T]his Court may affirm the judgment of the circuit court for any reason, even if not for the reason stated by the circuit court.” Acra v. State, 105 So.3d 460, 464 (Ala.Crim.App.2012).
Many of the, claims raised by Walker concern allegations that his counsel’s performance at his capital-murder trial was ineffective. “The right to counsel requires more than the presence of a lawyer; it necessarily requires the right to effective assistance. ■ However, the right does no.t provide a right to errorless counsel, but rather to objectively reasonable representation.” Lopez v. State, 343 S.W.3d 137, 142 (Tex.Crim.App.2011). “A defense attorney is not ineffective solely because his client is sentenced to death.” Payne v. State, 791 So.2d 383, 405 (Ala.Crim.App.1999).
The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), held that to prevail on a claim of ineffective assistance of counsel a petitioner must establish: (1) that counsel’s per *263 formance was deficient and (2) that the petitioner was prejudiced by. the deficient performance.
“Judicial scrutiny of counsel's" performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might. . be considered sound trial strategy.’ There are countless ways to provide effective assistance in any given case. Even the best criminal, defense attorneys would not defend a particular client in the same way.”
Strickland, 466 U.S. at 689 (citations omitted).
“The purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)CWe are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and ■an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this -fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. ' So, omissions are inevitable.' But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).
“An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, ‘where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.’ Williams [v. Head,] 185 F.3d 1223, 1228 [(11th Cir.1999) ]; see also Waters [v. Thomas,] 46 F.3d [1506,] 1516 [(11th Cir. 1995) ] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).”
Chandler, 218 F.3d at 1314 n. 15.
Walker was represented at the guilt and penalty phase of his capital-murder trial by Michael Crespi and David Hogg. Before the final sentencing hearing, Crespi and Hogg withdrew and Charles Decker was appointed to represent Walker. Crespi and Hogg testified at the postconviction evidentiary hearing. Both parties stipulated that Decker currently “suffers from a serious' degenerative brain illness called *264 frontal .temporal dementia” and, thus, was unable to testify at that hearing. (R. 795.)
I.
Walker first argues that the circuit court erred in denying him relief on his claim that his trial counsel were ineffective because, he' says, they failed to investigate' and prepare an effective cross-examination of the ' State’s key witness — -Timothy Byrd — a former cell máte of Walker’s, who testified that Walker had told him that he was the one who killed Thweatt.
A.'
First, Walker argues that his trial counsel failed to find valuable impeachment evidence to adequately cross-examine Byrd.
Initially, the State argues that this claim is proeedurally barred in this postconviction proceeding because, it says, the claim was raised and addressed by this Court on Walker’s direct appeal. See Rule 32.2(a)(4), Ala. R.Crim. P. The State asserted this ground of preclusion in its response to Walker’s fourth amended post-conviction petition. (C. 974 and 1990.)
. On direct appeal, Walker argued that he was denied the effective 'assistance of counsel because, he said, his trial counsel did not adequately, prepare to cross-examine Timothy Byrd. On direct appeal, this Court stated the following concerning this issue:
“The last witness the State called was Timothy Byrd, who had been incareerat-■ed in the Houston Gounty Jail • with [Walker] after the victim was murdered and to whom [Walker] had allegedly made a statement about his involvement in the murder. . Before Byrd testified, defense counsel objected on the ground that the veniremembers had not been questioned' about him during the voir dire proceedings and on the ground that [defense counsel] had not been given notice of the statement [Walker] allegedly made to him. However, after the prosecutor showed lead defense counsel his initials and a date on Byrd’s statement, lead defense counsel agreed that the State had provided the statement in discovery.
[[Image here]]
. [D]efense counsel asked for time until- the' next morning to determine how to deal with the situation. In - conjunction therewith, defense counsel asked to have Byrd available for further cross-examination the next day; ■ immediate access to jail records regarding Byrd and [Walker]; a chance to talk to [Walker] after the day’s proceedings and before he was returned to the jail;’ and access to letters or written communications from Byrd to the district attorney regarding providing information about other inmates. The trial court granted the requests.,
“The next morning, lead defense counsel recalled Byrd and questioned him extensively about his prior convictions; whether he had known [Walker] before they were incarcerated in the Houston County Jail and whether they had had an argument over the telephone and a subsequent'physical altercation; whether he had repeatedly tried to get his sentence(s) reduced; whether, in conjunction therewith, he had written letters to the circuit clerk, a circuit judge, and the district attorney; whether he had previously offered to provide information about other inmates on at least two other occasions; and whether he had been given medication for mental problems.
“During the hearing on [Walker’s] motion for a new trial, lead defense counsel .testified that he did not feel like he was able to prepare adequately for *265 Byrd’s testimony and that he did not have time to locate witnesses who might have contradicted Byrd’s testimony. However, he admitted that the trial was recessed until the next morning; that he and co-counsel reviewed the circuit clerk’s files on Byrd and found extensive correspondence between Byrd and the circuit clerk and a circuit judge; and that the district attorney gave them documents that related to the situation with Byrd, Co-counsel also testified, stating that the trial court gave them a recess for the balance of a day to prepare for further examination of Byrd; that he had the circuit clerk’s office search for letters from Byrd; that he reviewed documents that were produced by the circuit clerk’s offiee and the district at.torney’s office; and that he contacted the jail, but did not- learn anything of value. Co-counsel also testified that he did not use any confidential information that he had obtained in representing Byrd during the trial.”
Walker, 932 So.2d at 149-50. Ultimately, this Court held that Walker’s trial counsel’s actions were deficient but that Walker had not been prejudiced by that deficient •performance:
“[Although defense counsel had not prepared initially for Byrd’s testimony, there is not any indication that that initial lack of preparation prejudiced [Walker]. During his initial cross-examination of Byrd, lead defense counsel thoroughly questioned him about his motive for testifying against [Walker] and about whether he had offered to testify against other inmates. The trial court then gave counsel extra time to investigate Byrd and to prepare to examine him further. During that time, counsel obtained records from the circuit clerk’s office, the district attorney’s office, and the sheriffs department/jail, which they subsequently used in questioning Byrd. The next morning, lead defense counsel questioned Byrd extensively about a pri- or argument and/or altercation with [Walker]; his motive for testifying; his prior convictioris; his prior offers to testify against other inmates; and his repeated attempts to get his sentence(s) reduced. Under these circumstances, we do not find that [Walker] was prejudiced by the initial lack of preparation.

«

“Because [Walker] was not prejudiced by his attorneys’ initial lack of preparation ...,' he is not entitled to relief under Strickland.”
932 So.2d at 150-51. This claim was raised and addressed by this Court on direct appeal; therefore, pursuant to Rule 32.2(a)(4), Ala. R.Crim. P., it is procedurally barred in this postconviction proceeding.
The circuit court, like this Court on direct appeal, also found that Walker was due no relief on this claim because, it determined, he could.-establish no prejudice. The circuit court made the following findings of fact:
“Mr. Crespi received a copy of discovery from the State denoting that Byrd would be called as a witness, however this copy was overlooked by Mr. Crespi who was oblivious to the fact that Byrd would testify for the State. Nonetheless, the Court recessed at that point to allow Mr. Crespi time to conduct an adequate investigation into Byrd’s statement. With the substantial amount of time given by the Court to Mr. Crespi to investigate Byrd’s statement he was able to find correspondence that Byrd had addressed to court officials, he obtained Byrd’s personal information (from the court clerk’s file); and additional information, from law enforcement sources. Mr. Crespi identified other actions he would have taken had he not overlooked *266 the fact that Byrd was testifying; however ‘[hindsight is not always 20/20, but hindsight is always ineffective in evaluating performance of trial counsel.’ Tarver v. State, 629 So.2d 14, 19 (Ala.Crim.App.1993).
[[Image here]]
“Mr. Crespi was given additional time by the Court to investigate Byrd’s testimony. Because of this Mr. Crespi had a reasonable opportunity to find witnesses with information to impeach Byrd’s testimony. [Walker] offers that Otis Chapman ... should have been interviewed or offered by counsel as [a] witness[]. Mr. Chapman’s testimony would have served very little service, if any, in helping to impeach Byrd’s testimony. Mr. Chapman testified that the extent of his relationship with [Walker] was one of . only being cellmates, and that Timothy Byrd was actually closer to [Walker].
[[Image here]]
“[Walker] seems to rely heavily upon the opinion that Byrd was a snitch, and would have the Court base its decision upon the same meritless allegation. Mr. Crespi was able to review discovery information that was provided to him dur'ing the time that the Court granted him to investigate Byrd’s testimony. Mr. Crespi was able to cross-examine Byrd thoroughly concerning his proposed sentence reduction request made to several court officials, in which no deals of reduction were granted.”
(C. 2280-82.) The circuit court’s findings are supported by the record.
In his fourth amended postconviction petition, Walker alleged that his trial counsel were ineffective for failing to impeach Byrd’s credibility because, he said, counsel failed to locate and call several witnesses. However,, on appeal, Walker argues that his trial counsel were ineffective for failing to locate only his former cell mates — Chris Tudor and Otis Chapman.[1]
As the State correctly asserts in its brief, Walker did not allege in his postcon-viction petition that his trial counsel were ineffective for failing to call Chris Tudor to impeach Byrd’s credibility. Therefore, any claim as to Tudor is not properly before this Court.[2] See Hooks v. State, 21 So.3d 772, 795 (Ala.Crim.App.2008).
At the postconviction hearing, Otis Chapman, who was then incarcerated at Bullock Correctional Facility, testified that he had been in the Houston County jail in 2000 and in 2001 and that he had been in a four-person cell with Byrd and Walker-for a portion of that time. He said that Byrd had a reputation for being a liar and a snitch and that Byrd and Walker had had a physical altercation and Byrd then “went to another cell.” (R. 429.) On cross-examination, Chapman admitted that he had been convicted of rape, sodomy, arson, and assault.
After reviewing trial counsel’s cross-examination of Byrd, as detailed in this Court’s opinion on direct appeal, we agree with the circuit court that the exclusion of Chapman’s testimony had very little impact on the proceedings; thus, Walker was not prejudiced. Walker failed to satisfy *267 the Strickland standard in regard to this claim and is therefore due no relief.
B.
Walker next argues that one of his trial attorneys had an irreconcilable conflict of interest that resulted in the denial of his right to counsel. Specifically, he argues that, because Hogg had previously represented Byrd in an unrelated case, Hogg had an actual conflict of interest in his representation of Walker. He further argues that he was not required to satisfy the Strickland standard and that, as to this claim, prejudice is presumed.
The circuit court made the following findings of fact concerning this claim:
“The possible conflict of interest concerning Mr. Hogg’s past representation of Byrd was addressed by the Court, and upon this Walker decided to proceed with his present counsel of Mr. Crespi and Mr. Hogg. In addition, Mr. Crespi, not Mr. Hogg was lead counsel and he alone .(Crespi) conducted the cross-examination of Byrd. In a claim alleging ineffective assistance of counsel, ‘a defendant must show that his counsel’s earlier representation of the witness was substantially and particularly related to counsel’s later representation of [Walker], or that counsel actually learned particular confidential information during prior representation of the witness that was relevant to [Walker’s] case.’ Williams v. State, 574 So.2d 876, 878 (Ala.Crim.App.1990). Here, Mr. Crespi handled Byrd as a witness not Mr. Hogg, thus there was no relation between Mr. Hogg’s prior representation of Byrd and his subsequent representation of Walker; neither was there relevancy of Byrd’s attorney-client privilege in [Walker’s] case.”
(C. 2281-82.) Initially, we note that this issue was raised and addressed on direct appeal;, therefore, it is procedurally barred in this postconviction proceeding.. See Rule 32.2(a)(4), Ala. R.Crim. P.
Moreover, this Court has stated that “prejudice is presumed when a defendant establishes that his attorney had an actual conflict of interest that adversely affected the attorney’s performance.” Byrdsong v. State, 822 So.2d 470, 474 (Ala.Crim.App.2000). On direct appeal, this Court implicitly found that the presumed-prejudice standard did not apply; rather, we found that Walker had failed to prove prejudice. We said:
“[T]he record does not indicate that [Walker] was prejudiced by the fact that co-counsel had • previously represented Byrd. Although co-counsel could not provide confidential information from his files, lead defense counsel was able to gain much of the same information from the documents that were produced by the circuit clerk’s office, the district attorney’s office, and the sheriffs department/jail. Furthermore, as the trial court noted, lead defense counsel conducted the examination of Byrd. Therefore, we do not find that [Walker] was prejudiced in this regard.
“Because [Walker] was not prejudiced by ... co-counsel’s previous representation of Byrd, he is not entitled to relief under Strickland.”
Walker, 932 So.2d at 150.
Accordingly, in this postconviction proceeding, Walker was required to prove prejudice to prevail on this claim.
“To prove that an actual conflict adversely affected his counsel’s performance, a defendant must make a factual showing ‘that his counsel actively represented conflicting interests,’ Cuyler v. Sullivan, 446 U.S. [335] at 350, 100 S.Ct. [1708] at 1719 [ (1980) ], ‘ “and must demonstrate that the attorney ‘made a *268 choice- between possible alternative courses- of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.’”’ Barham v. United States, 724 F.2d 1529, 1532 (11th Cir.) (quoting United States v. Mers, 701 F.2d 1321, 1328 (11th Cir.1983), cert. denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984)).”
Molton v. State, 651 So.2d 663, 669 (Ala.Crim.App.1994).
Hogg testified at the hearing on Walker’s motion for a new trial that he had not used any confidential information that he had gained through his representation of Byrd. Also, Crespi conducted Byrd’s cross-examination. Walker failed to establish any prejudice concerning Hogg’s prior representation of Byrd; .therefore, he failed to satisfy the Strickland standard and is' due no relief.
II.
Walker . next argues that the circuit court erred, in denying relief on his claim that his trial counsel were ineffective during the hearing on his motion to suppress his statements to police because, he says, counsel failed to make compelling arguments in support of that motion. Walker makes two different arguments in support of this claim.
The record shows that Crespi filed a pretrial motion to suppress Walker’s statements to police. In that motion, he argued that there had been no probable cause to arrest Walker and, thus, that Walker’s statements were inadmissible and that the police had failed to comply with the provisions of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
A
Walker first asserts that his trial counsel were ineffective for failing to argue that his statements to police were coerced because, he says, police implied that he would get youthful offender status, implied that there was nonexistent evidence that linked him to the murder, and told him that he should confess to resolve his mother’s outstanding arrest warrants.
The circuit court made the following findings of fact in regard to this claim:
“This claim is unfounded and is not supported by the record, nor does [Walker] offer,any specific evidence or legal authority- to support his contention that improper intimidation and manipulation tactics were used, to meet the standard of ineffective assistance of counsel under Strickland [v. Washington, 466 U.S. 668 (1984)]. Furthermore, trial counsel had an opportunity to cross-examine Lt. [Donald] Valenza, and Officers Mark Johnson and Keith Cook concerning the táctics used during [Walker’s] confession. Lastly, ‘the cases indicate that government agents may validly make some representation to defendant or may discuss cooperation without rendering the resulting confession involuntary.’ Jackson v. State, 562 So.2d 1373, 1383 (Ala.Crim.App.1990). As stated above, the record reflects that [Walker] voluntarily gave his statement without any intimidation and manipulation tactics by law enforcement. The tactics used by the officers were proper being that [Walker] did not request an attorney. Nor were there any threats made to [Walker] to secure his statement; under oath Valenza testified that neither he, nor his officers threatened [Walker].
[[Image here]]
“[Walker’s.claim that] trial- counsel ineffectively argued that [Walker’s], statements were coerced.
“[Walker] would rely on ‘... [t]he slightest menace or threat, or any hope *269 engendered or encouraged that [Walker’s] case will be lightened, ameliorated, or more favorably dealt with if he will confess ■ ... is enough to exclude the confession thereby superinduced.’ Williams v. State, 780 So.2d 673, 676 (Ala.2000) (quoting Womack v. State, [281 Ala. 499, 607,] 206 So.2d [579] at 587 (Ala.1967)). However, Womack goes on to say that, ‘unless it is shown by clear and full proof that the confession was voluntarily made after, all trace of hope or fear had been fully withdrawn or explained away and the mind of the prisoner' made as free from bias and intimidation as if no attempt had ever been made to obtain such confessions.’ Womack [281 Ala. at 507,] 205 So.2d at 587 (quoting Owen v. State, 78 Ala. 425, 428 (Ala.1885)). The issue of coercion (discussed above) concerning [Walker’s] statement was found to have no merit, and the same is true for counsel’s alleged ineffective arguing tactics of the statement given by [Walker]. Even more, trial counsel questioned Lt. Donald Valenza whether he ‘told Walker that things would go better with the [district attorney] if he talked to you’ and ‘it would help with the District Attorney if he talked with you.’ When these allegations were denied by Valen-za trial counsel went even further and attempted to impeach Valenza by directing him to the transcript of [Walker’s] statement1 stating ‘it is going to help the case.’ Trial counsel even questioned Va-lenza concerning the circumstances in which the statements were given, more specifically, whether [Walker] asked for a lawyer on June 22 after the recorder was turned off and getting the warrant of his mother lifted. More importantly, this Court after careful consideration, denied trial counsel’s motion to suppress [Walker’s]1 statement- based on the grounds which the motion was raised. From the record it is seen that the examination of the witness during the suppression hearing was consistent with .trial counsel’s strategy to show that [Walker’s] statement was not voluntary, thus trial counsel ‘exercised reasonable professional judgment.’ Grayson [v. Thompson ], 257 F.[3d] [1194] at 1218 [ (11th Cir.2001) ]. In addition, .[Walker] was properly'given his Miranda rights, he was aware of his right to counsel, he understood his rights and his statement was secured without threats or menace from law enforcement officers.”
(C. 2284-87.) The circuit court’s findings are supported by the record.
 Crespi testified at the postconviction hearing that he had been admitted to the Alabama State Bar in 1973,[3] that he had been a circuit judge from 1987 to 1999, that he was appointed to represent Walker in June 2000,, that he had worked on death-penalty cases before being appointed to Walker’s case, that he was lead counsel on the case, and that he.had billed 235 hours for his out-of-court work on the case. He testified that he had filed a motion to suppress Walker’s statements to police. In the motion, he argued that there was no probable cause to arrest Walker and, thus, that Walker’s 'Subsequent statements to police were unlawful and that Walker’s Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights had been violated. (R. .49.) Crespi said that he had no strategic reason for not raising the issues that Walker raised in his post-conviction petition and that, in preparing *270 for the suppression hearing, he had considered the statements that had Walker made to him during their interviews. (R. .123.)
At the postconviction hearing,- Hogg testified that Crespi had handled the motion to suppress, that he had reviewed Walker’s statements and had made a summary of objectionable conduct by the police, that he had given that summary to Crespi, and that Crespi did not cross-examine the police officers using Hogg’s summary.
The record- also shows that Lt. Donald Valenza of the Etowah County Sheriffs Department testified at the suppression hearing at Walker’s trial. He said that he had interviewed Walker a total of four times, that the first interview occurred on June 22, 2000, that he gave Walker his Miranda rights at that time, that Walker agreed to talk to police, that Walker did not appear to be under the influence- of any drug, that Walker was not threatened to make a statement, and that the statement was recorded. Lt. Valenza testified that he interviewed Walker a second time on June 23, 2000, at the offices' of the Etowah County Sheriffs Department. He said that Walker was given his rights, that Walker signed a waiver-of-rights form, that Walker was not threatened in order to secure his statement, that Walker was not offered “any hope of remuneration or reward to get him to make a statement,” and that Walker’s statement was " recorded. He next spoke to Walker, Lt. Valenza said, on June 27, 2000, at the offices of the Etowah County Sheriffs Department. He said that he advised Walker of his rights, that Walker did not appear to be under the influence of any drug, that Walker was offered no reward, that Walker indicated that he understood his rights, that Walker did not ask for an attorney, and that the interview was tape-recorded. Lt. Valenza further testified that the last time that he spoke with Walker was on June 28, 2000, when Walker was taken to the crime scene and retraced his and Beekworth’s steps on the night of the murder. He said that ■Walker’s statement was videotaped, that he read Walker his Miranda rights on- the tape, that Walker was not under the influence of any drug, that Walker was not threatened, and that Walker was not offered any reward or inducement to secure his statements.
At trial, Crespi cross-examined Lt. Va-lenza about what statements were made on June 22, 2000, before the tape recorder was turned on, about his statement to Walker that “I can tell you right now it is going to help the case,” and about whether Walker asked .for a lawyer after the tape was turned off following that first interview. The. following occurred during cross-examination:
“[Defense counsel]: At the time you had your interview on the 22, where exactly was James Earl Walker?
“[Lt. Valenza]: Incarcerated in the Eto-wah-County jail.
“[Defense counsel]: Did that interview take place in a cell?
“[Lt. Valenza]: No. I don’t recall us being in a cell.
“[Defense counsel]: Where did it take place?
“[Lt. Valenza]: We spoke outside in a basketball court area one time. I can’t remember if that is where it was recorded or downstairs. As far as going in a cell, I don’t recall going in a cell.
[[Image here]]
“[Defense counsel]: In-the course of the interview on the 22, didn’t you also talk with Mr. Walker about getting a warrant, outstanding warrant against his mother?
“[Lt. Valenza]: I talked about it. I am not sure what date it was. We had an outstanding warrant against his mother.
*271 “[Defense counsel]: From down here in Houston County? Correct?
. “[Lt. Valenza]: That is correct.. “[Defense counsel]: And, there was a discussion about having that lifted to come see him in jail? Correct? ,
“[Lt. Valenza]: No. I think- it was discussed having it lifted, because one of the main reasons we got on her to find him was we knew they wouldn’t be far away from each other. He asked to speak to his mother and I made that arrangement.
“[Defense counsel]: That was part of your discussions relative to his statement? Correct?
“[Lt. Valenza]: Do what?
“[Defense counsel]: It was part of the discussion you had with him concerning whether he was going to give a statement. Isn’t that true?
“[Lt. Valenza]: I think if you will read a few lines, whichever statement that is in, a few lines down from that—
“[Defense counsel]: Okay.
[[Image here]]
“[Defense counsel]: You told him it was more likely than not that they would lift the warrant? Correct? About a third of the way down?
“[Lt. Valenza]: Hang on just a second. Okay. Are you talking about where it says: You are still going to try to help me mama like that?’
“[Defense counsel]: Yes.
“[Lt. Valenza]:. Just below that? -
“[Defense counsel]: A little bit farther down from there.
“[Lt. Valenza]: Yes. Can you — the part where I am saying: T will go back, I will call like I said.’
“[Defense counsel]: Yes, sir. And—
“[Lt. Valenza]: And, I also say: T am not promising you nothing. I have never promised you nothing from the beginning.’ ”
(R. 77-80.) Investigator Keith Cook of the Houston County Sheriffs Department testified to facts similar to those that were brought out in Lt. Valenza’s. examination.
In reviewing a circuit court’s ruling on a motion to suppress a confession or statement, we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445. (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself..,.’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ Thesé constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of á criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held 'that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Cu *272 lombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme' Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne ’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances- to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 64 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 605 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to. admit a eon-fession, a court must determine that the defendant’s will ..was not overborne by pressures and circumstances swirling around him); Bakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’Xempha-sis added).”
718 So.2d at 729 (footnote omitted).
In discussing the Supreme Court’s decision in McLeod, this Court has stated:
“The Court in McLeod [v. State, 718 So.2d 727 (Ala.1998),] focused on the ‘totality of the circumstances’ surrounding McLeod’s confession rather than merely the interrogator’s statement. McLeod, 718 So.2d at 729. Under this analysis, implied and/or vague promises, absent coercive' conditions and' given a defendant whose personal characteristics do not make him unusually susceptible to inducement, are not sufficient to render . a confession involuntary. McLeod, 718 So.2d at 724....
“‘A statement made by a law enforcement agent to an accused that the accused’s cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to fender a subsequent incriminating .statement involuntary,’
“United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir.1985), citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978).
“Under the ‘overborne’ standard expressed in McLeod and used by federal courts, the statement made by [law enforcement] was not coercive. When determining the admissibility of a confession, this Court must look at the entire circumstances, not only the behavior of the interrogators in creating pressure, but also the defendant’s experience with the criminal justice system and personal characteristics. McLeod, 718 So.2d at 729; Ex parte Gaddy, 698 So.2d [1150] at 1154, 1165 [ (Ala.1997) ]. The appellant in this case had broad experience with the criminal justice system; he had either an eighth- or ninth-grade education; and the record does not reflect that he had any mental deficiencies. These factors indicate that the appellant *273 was even less susceptible to inducement than was McLeod, who had had little- or no previous experience with the criminal justice system. Furthermore, the statement made by [law enforcement] offered no specific reward for confessing and was analogous to statements that- the defendant’s cooperation ‘would probably be helpful’ permitted ■ in Davidson. There was no evidence that [law enforcement] used any means of-intimidation or any other improper methods of interrogation. [The law-enforcement officer] was merely giving .his opinion to the appellant regarding the appropriateness of his confessing. Given the totality of the circumstances, the State met its burden of proving that the appellant’s confession was voluntary.”
Craig v. State, 719 So.2d 274, 278-79 (Ala.Crim.App.1998).
“[T]rickery is not automatically coercion. Indeed, the. police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations.”
United States v. Byram, 145 F.3d 405, 408 (1st Cir.1998). “A misrepresentation which prompts inculpatory statements is only one factor to be considered in determining the voluntariness of the resulting statements.” People v. Kashney, 111 Ill.2d 454, 466, 95 Ill.Dec. 835, 840, 490 N.E.2d 688, 693 (1986). “Trickery or deception does not. make a statement involuntary unless the method [is] calculated to produce an untruthful confession or was offensive to due- process.” Creager v. State, 952 S.W.2d 852, 856 (Tex.Crim.App.1997). See also C.T. Drechsler, Admissibility of Confession as Affected by its Inducement Through Artifice, Deception, Trickery, or •Fraud, 99 A.L.R.2d 772 (1965).
‘“[C]ourts have found waivers to be voluntary even in cases where officers employed deceitful tactics.’ Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (en banc). See also [Colorado v.] Spring, 479 U.S. [564] at 575-77, 107 S.Ct. 851 [(1987)]; United States v. Tapp, 812 F.2d 177, 179 (5th Cir.1987), ‘[T]rickery or deceit is only prohibited to the extent it deprives the suspect “of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.”’ Soffar, 300 F.3d at 596 (quoting Moran [v. Burbine ], 475 U.S, [412] at 424, 106 S.Ct. 1135 [ (1986) ]). See also [United States v.] Farley, 607 F.3d [1294] at 1327 [ (11th Cir.2010) ]. ‘Of course, trickery can sink to the level of coercion, but this - is a relatively rare phenomenon.’ United States v. Flemmi, 225 F.3d 78, 91 n. 5 (1st Cir.2000). ‘Generally, courts have held statements involuntary because of police trickery only when: other aggravating circumstances were also present.’ Farley, 607 F.3d at 1328 (citing [United States v.] Castaneda-Castaneda, 729 F.2d [1360] at 1363 [ (Fla.1984) ]). , For example, ‘statements have been held involuntary where the deception took the form of a coercive threat ,.. or where the deception goes directly to the nature of the suspect’s rights and the consequences of waiving them.’ Id. at 1328-29 (citations omitted).”
United States v. Degaule, 797 F.Supp.2d 1332, 1380 (N.D.Ga.2011).
After examining Walker’s statements, we find no evidence that police offered Walker any promises or inducements to secure his statements. . Walker was not promised that he would be given *274 youthful offender status, nor was he promised that police would lift his mother’s arrest warrant. Indeed, trial counsel cross-examined Lt. Valenza about statements he had made to Walker concerning his mother’s arrest warrants. As Lt. Va-lenza said, he made no promises to Walker. Based on the totality of the circumstances, we find that Walker’s statements to police were voluntary. “Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009). Walker is due no relief on this claim.
B.
Walker next argues that his trial counsel were ineffective for failing to argue that his statements should have been suppressed because of the lengthy delay between his arrest and his presentment to a magistrate.
The trial record shows that Walker was arrested on June 20, 2000, on unrelated outstanding warrants, that he was held without bond, that he was formally charged with capital murder on June 29, 2000, and that he was brought before a magistrate on June 29, 2000.
The circuit court made the following findings concerning this claim:
“[Walker] claims that this ‘undue delay’ stems from his arrest on June, 20, 2000, and was not presented for his initial appearance until June 29, 2000, thus being in violation of Ala. R.Crim. P. 4.3(b). However, [Walker] does not offer sound evidence to support this claim, besides trial counsel did not raise this issue. The Alabama Rules of Criminal Procedure state that an arrested person shall not be held for more [than] ‘... seventy-two (72) hours after arrest, unless the charge upon which the person was arrested is not a bailable offense ...’ Ala. R.Crim. P. 4.3(b)(3). (Emphasis added.) [Walker’s] arrest report indicated that he was arrested on numerous warrants and that he was being held for ‘no bond.’ Walker has failed to meet his burden of proof proving he was prejudiced by his trial counsel’s performance under Strickland [v. Washington], 466 U.S. [668,] 687 [ (1984),] or offering any evidence that had he been presented before a judge in Etowah County he would have been released. Even more, [Walker] was returned to Houston County on June 28, 2000, and brought before a judge for his initial appearance on June 29, 2000, well within the 72 hours expressed in the Alabama Rules of Criminal Procedure.”
(C. 2288.)
In Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), this Court recognized that a delay in presenting a defendant to a magistrate is one factor to assess when determining the voluntariness of a confession made during the delay, but we held that it is not the determinative factor.
“ ‘[W]e follow the majority view and hold that a delay in presenting one arrested without a warrant to a judge for a probable cause hearing is one circumstance to be considered in determining the vol-untariness of a statement given during the delay.’ Hammond v. State, 497 So.2d [558] at 565 [ (Ala.Crim.App.1986) ]. We have reviewed the totality of the circumstances surrounding the appellant’s statements to [law enforcement] concerning the pistol, including the circumstance of pretrial detention, and we find that they were voluntarily made, after proper Miranda warnings. We find no evidence of promises, threats, improper inducements, or coercion in the procurement of the statements. We find no evidence that the *275 single factor of delay in providing the appellant with a probable cause determination before a judge or magistrate affected the voluntariness of his statements about the pistol. We conclude that those statements were not the product of any unlawful detention.”
695 So.2d at 124. Other states have reached this same conclusion. See People v. Mitchell, 366 Ill.App.3d 1044, 1049, 304 Ill.Dec. 823, 829, 853 N.E.2d 900, 906 (2006)(“While there is no separate remedy for violation of the presentment rule, Illinois courts have held that the delay is a factor to be considered when determining whether the confession was voluntary.”); Marr v. State, 134 Md.App. 152, 166, 759 A.2d 327, 334 (2000) (“[T]he delay in bringing the defendant before a judicial officer after an arrest is ‘only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.’ ”); Wright v. State, 633 A.2d 329, 334 (Del.1993) (“Each case must be judged on its own facts and among the factors to be considered are the length of the delay and the atmosphere surrounding the detention.”); Byrd v. United States, 618 A.2d 596, 598 (D.C.1992) (“[W]e have held that a valid waiver of Miranda rights also constitutes a waiver of the right to prompt presentment before a court.”); and Boyd v. State, 811 S.W.2d 105, 125 (Tex.Crim.App.1991) (“[A] violation of the requirement that a defendant be taken before a magistrate without delay will not invalidate a confession which was voluntarily given after a defendant received his Miranda rights.”).
As this Court held in Part II.A. of this opinion, Walker’s statements to police were voluntary. The delay in presenting Walker to a magistrate, on unrelated charges, did not render Walker’s statements involuntary. Because the substantive claim has no merit, trial counsel was not ineffective for failing to raise this issue. See Lee v. State, supra. Walker is due no relief on this claim.
III.
Walker next argues that his trial counsel were ineffective for failing to present exculpatory evidence, for failing to interview a defense witness before trial, for failing to object to prosecutorial misconduct, and for conceding Walker’s guilt on the burglary charge. We will address each claim individually.
A.
First, Walker argues that his trial counsel were ineffective for failing to investigate and present the testimony of Joseph Farrar and Sherry Bowman because, he says, their testimony amounted to exculpatory evidence.
The circuit court made the following findings concerning this claim:
“[Walker] claims that Mr. [Joseph] Farrar, Ms. [Sherry] Bowman, and Mr. [David] Pitts should have been called as witnesses to present exculpatory evidence, and because of this [Walker’s] Sixth Amendment [rights were] violated and it ‘substantially prejudiced Mr. Walker’s defense.... ’[4] The extent of testimony Ms. Bowman and Mr. Pitts had to offer was reportedly having seen different cars near the victim’s residence. Mr. Farrar reportedly saw two men in a car outside his house while it was • being burglarized, and ... he did not recognize the men shown to him by investigators. However, Mr. Farrar did *276 testify that the. men in the car were two white males; furthermore, he did not testify that [Walker] was one of the males he saw outside of his home. None of the testimony [of] either of the witnesses would have been exculpatory!;] if anything, Mr. Farrar’s testimony supported the notion that [Walker] was out- . side his home and burglarized it.”
(C. 2289.)
' Bowman testified at the postconviction hearing, stating that on January 9, 2000, she observed a “big car” outside Thweatt’s house. The car, she said, could have been a Lincoln Town car. (Walker’s car was a smaller car — a Chevrolet Celebrity.) Far-rar testified that his house in Piedmont was burglarized in December 1999 and that a rifle' was stolen. (That rifle was identified as the murder weapon.) He said that he saw two white young men in a car outside his residence at the time of the burglary but that he could not identify them from the photographs he had been shown.[5] (Walker’s photograph was one of the photographs that Farrar had been shown.) Farrar also testified that he saw the two men through his truck window for only about 30 seconds and that he did not recognize the faces of those two men.
Neither Crespi nor Hogg were asked about Bowman or Farrar, so the record is silent as to why those two-individuals were not called to testify at Walker’s trial or if counsel was even aware of their testimony. “It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions or inac-tions that occurred outside the record.” Broadnax v. State, 130 So.3d 1232, 1255 (Ala.Crim.App.2013).
“ ‘An ambiguous or silent record is hot sufficient to disprove the' strong and continuing presumption [of effective representation], Therefore “where the record is incomplete or unclear about [counsel’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.”’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999)).” '
Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001). In the absence of a record concerning counsel’s actions, we must presume that those actions were reasonable.
Moreover, we do not agree with Walker’s characterization of this evidence. “Exculpatory evidence” is defined as “[evidence tending to establish a criminal defendant’s innocence.” Black’s Law Dictionary 675 (10th ed.2014). Farrar testified at the postconviction hearing that he could not identify any person from the photographs he had been shown. On cross-examination, Farrar said that he saw two white young men — he did not say that one of the men in' the- car was not Walker. Bowman merely, testified that she observed a large car outside Thweatt’s house on January 9, 2000.[6] We fail to see how either statement constituted “exculpatory” evidence.
Also, Crespi testified at the postconviction hearing that he attended Beckworth’s trial. In that trial, testimony was presented that Beckworth had told police that, in *277 “late December 1999, hé and Walker broke into a house and stole a ,22 caliber rifle.” Beckworth v. State, 946 So.2d. 490, 498 (Ala.Crim.App.2005). Counsel was aware that Beckworth had told police that he and Walker had stolen the .22 caliber rifle used in the homicide.
Based on the facts in this case we,‘ can-mot say that Walker’s .trial counsel was ineffective for failing to present the testimony of Bowman and Farrar. Walker failed to satisfy the Strickland standard in regard to this claim and is, therefore, due no relief.
B.
Walker next argues that his trial counsel were ineffective for failing to interview Mark Peacock, Thweatt’s grandson and a former cell mate of Beckworth’s, before calling him as a defense witness at Walker’s trial. Walker appears to' argue that his trial counsel’s failure to interview Pea'cock constituted per se ineffective assistance of counsel and that counsel’s failure to interview Peacock-resulted in an emotional outburst by Peacock while'testifying.
The circuit court made the following findings concerning this claim:
“Because Crespi’s decision to call Mark Peacock as a witness did not go as planned still does not support the allegation of ineffective assistance of counsel. ‘The fact that trial counsel’s strategy was unsuccessful in no way demonstrates that, they were ineffective.’ Lee v. State, [44 So.3d 1145 (Ala.Crim.App.2009) ].”
(R. 2291.)
On Walker’s direct appeal, • this Court stated the following concerning Peacock’s testimony: , , ,
“One of [the victim’s] grandsons, Mark Peacock, a convicted felon who was incarcerated at the time of trial, testified that he knew Beckworth and that", he . had spoken with him as .they passed .time- together when they both had ‘a lot of time’ on their hands, approximately three years before the trial. Peacock had mentioned to Beckworth that his grandmother had farmland around her house and a red 1977 Thunderbird automobile in her yard; Beck-worth had indicated to Peacock that he was familiar with the area where [the victim] lived. Peacock also acknowledged that he informed Beckworth, ‘[M]y grandmother probably has" more money than she knows what to do with.’ ”
Beckworth, 946 So.2d at 496-97.
The record of Walker’s trial shows that the following occurred when Crespi questioned Peacock:
“[Defense counsel]: Now, in the course of your acquaintance with Mr. Beck-worth,-you and he talked from time to time? Is that correct?
“[Peacock]: Yes.
'“[Defense counsel]: Now, let me make sure I understand one thing about places. You didn’t meet him at the Lo[x]ley Work Release, but did you have any contact with him at Lo[x]ley Work Release?
“[Peacock]: No, sir. "
“[Defense counsel]: Was your contact purely in Geneva County with him?
“[Peacock]: I believe so. Yes. I never met Beckworth on the street before.
“[Defense counsel]: Yes, sir.
“[Peacock]: I never knowed [sic] him other than in incarceration or a brief moment. And, I definitely don’t know That fellow right there.
“[Defense counsel]: Okay. .Now, let’s clear that up. You looked off. to your right, what fellow right there—
*278 “[Peacock]: I am referring to the guy that killed my grandmamma. You are asking me all these questions about my personal life and—
“[Defense counsel]: Yes, sir. All right.
“[Peacock]: You know, he ain’t shed no thing, he ain’t shed no tears; y’all seen him crying or any kind of remorse? He is supposed to kill my grandmamma.”
(Trial R. 1097-98.) Defense counsel then approached the bench and requested that the circuit court admonish the witness not to volunteer information, that the court strike the witness’s nonresponsive comments, and that the court grant a mistrial. The circuit court admonished the jury to disregard Peacock’s remarks.
At the postconviction evidentiary hearing, Crespi testified that he decided to call Peacock as a defense witness based on Peacock’s testimony at Beckworth’s trial— testimony that Crespi had witnessed. During Walker’s cross-examination of Crespi, the following occurred:
“[Assistant Attorney General]: Opposing counsel mentioned you called Mark Peacock as a witness during the Defense’s case, correct?
“[Crespi]: Yes, sir.
“[Assistant Attorney General]: And you’ve already stated that you were present during Beckworth’s trial?
“[Crespi]: I do remember his testimony. Yes, sir.
“[Assistant Attorney General]: Okay. And you testified that your decision to call Mr. Peacock during Walker’s trial was based on his testimony during Beck-worth’s trial, correct?
“[Crespi]: That’s correct.
“[Assistant Attorney General]: And would you not agree that Mr. Peacock’s testimony during the Beckworth trial would be consistent with your overall strategy in Walker’s case that the idea for the crime was Beckworth’s, and that Walker didn’t intend to commit murder?
“[Crespi]: That is correct, sir.”
(R. 110-11.)
“A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person’s account is otherwise fairly known to defense counsel.” United States v. Decoster, 624 F.2d 196, 209 (D.C.1976).
“ ‘There is ... no per se rule that failure to interview witnesses constitutes ineffective assistance. Ineffective assistance cases turn on their individual facts.’ Sanders v. Trickey, 875 F.2d 205, 209 (8th Cir.1989).
“ ‘ “[The] failure to conduct a pretrial investigation and interview witnesses is not a per se sixth amendment violation.” Code v. Montgomery, 799 F.2d 1481, 1484 (11th Cir.1986). A counsel’s decision to not investigate “must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” Strickland [v. Washington], 466 U.S. [668] at 691 [ (1984) ]. Also, the question of deficient performance “is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’” Payne v. Allen, 539 F.3d 1297, 1315 (11th Cir.2008) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).’
“Hall v. Thomas, 623 F.Supp.2d 1302, 1318 (M.D.Ala.2009).”
Benjamin v. State, 156 So.3d 424, 442 (Ala.Crim.App.2013). See also Sanders v. Trickey, 875 F.2d 205, 209 (8th Cir.1989) (“There is, however, no per se rule that failure to interview witnesses constitutes *279 ineffective assistance.”); and United States v. Glick, 710 F.2d 639, 644 (10th Cir.1983) (“An attorney’s decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.”). Walker’s counsel was not per se ineffective for failing to interview Peacock before trial.
Walker also argues that if counsel had interviewed Peacock he would not have engaged in his emotional outburst. However, defense counsel is not responsible for unresponsive comments made by a witness. See Baumruk v. State, 364 S.W.3d 518, 535 (Mo.2012) (“‘Defense counsel cannot be ineffective for attempting to impeach the state’s witness and receiving a nonresponsive statement.’ ”); State v. Foust, 105 Ohio St.3d 137, 159, 823 N.E.2d 836, 862 (2004) (“It is not ineffective assistance to fail to anticipate a nonre-sponsive answer to some questions.”); Douglas v. State, 951 P.2d 651, 679 (Okla.Crim.App.1997) (“Counsel cannot be held ineffective for Appellant’s voluntary non-responsive comment which put his character in issue.”); Commonwealth v. Boyles, 407 Pa.Super. 343, 357, 595 A.2d 1180, 1187 (1991) (‘We will not deem counsel to be ineffective when a defense witness gives nonresponsive and unhelpful answers to proper questions.”); and Lewis v. State, 767 S.W.2d 49, 53 (Mo.Ct.App.1989) (“Just as a lawyer cannot be labeled ineffective because a witness unexpectedly changes his testimony on the witness stand .... he cannot be so labeled when a witness makes an unexpected and nonresponsive answer that contains inadmissible evidence.”).
Crespi testified that his strategy was to show that Beckworth was the leader and instigator of the events that lead to Thweatt’s death and that Peacock’s testimony was consistent with that strategy. Counsel was not ineffective for'calling Peacock after witnessing his sworn testimony at Beckworth’s trial. Nor was counsel responsible for Peacock’s unsolicited outburst. , Based on the facts .of this case, we cannot say that Walker satisfied -the Strickland standard in .regard to this claim. Thus, he.is due no relief.
c.:
Walker next argues that the circuit court erred in denying his claims that his trial counsel were ineffective for failing to object to certain instances of prosecuto-rial misconduct. Specifically, Walker argues that counsel failed to object to the State’s bolstering of Byrd’s testimony, failed to object to the State’s reference to facts not in evidence, and failed to object to the State’s improper comments about senior citizens.
When denying relief on this claim, the circuit court made the following findings:
“On direct appeal, the Alabama Supreme Court rejected each of [Walker’s] claims of prosecutorial misconduct. More specifically, [Walker’s] claim that the prosecution improperly vouched for the credibility of Byrd during closing arguments; commentary made by prosecution on facts that were never introduced as evidence; and commentary regarding children and senior citizens were all rejected. Ex parte Walker, 972 So.2d 737, 745-46 [ (Ala.2007) ]. This Court agrees with the Alabama Supreme. Court and rejects all these claims because there is no substantial evidence offered by [Walker] that these alleged instances, ‘infected the trial with unfairness.’ Id. at 747. Furthermore, the Court of Criminal Appeals has held that a prosecutor ‘may also present his impression from the evidence’ during a trial. Turner v. State, 924 So.2d 737, 767 (Ala.Crim.App.2002).” .
(C. 2292-93.)
In, addition to noting that the Alabama Supreme Court has reviewed each of the *280 substantive claims for plain error and has found none, the circuit court further rejected these claims because Walker failed to' present “substantial evidence” at ’the hearing on his Rule 32 petition indicating that “these alleged instances ‘infected the trial with unfairness.’ ” (C. 2292-93.) Moreover, the circuit court correctly found that it was not error for a prosecutor'to “present his impréssion from the evidence during a trial.” Turner v. State, 924 So.2d 737, 767 (Ala.Crim.App.2002). See Ex parte Taylor, 10 So.3d 1075 (Ala.2006)(discussion of prejudice under plain-error review and ineffective assistance of counsel). We agree with the circuit court that Walker is due no relief on this claim,
D.
Walker next argues that the circuit court erred in denying relief on his claim that his trial counsel were ineffective for conceding that he was guilty of the burglary charge. He argued in his postconviction petition that counsel were per se ineffective for making this concession without Walker’s consent and that the presumed-prejudice standard set out by the United State's Supreme Court in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), applies in this case.
In addressing this claim, the circuit court made the following findings:
“[Walker’s] claim on concession of guilt was trial counsel’s defense strategy ‘that' [Walker] was an accomplice in a burglary' and íio more than -that.’ [Walker’s] claim that counsel’s action of concession of guilt allegedly ‘without [Walker’s] consent’ was ‘per se’ ineffective assistance of counsel is meritless. Even more the United States Supreme Court has held that ‘counsel’s strategic choice is not impeded by any blanket rule demanding the defendant’s explicit consent.’ Florida v. Nixon, 543 U.S. 175, 192 (2004). [Walker] has not proved (this claim nor prior discussed claims) that trial counsel’s performance was deficient or that this deficient performance prejudiced him under Strickland, 466 U.S. at 687, thus this claim is denied,”
(C. 2294-95.)
Walker asserts that this claim is governed by the “presumed prejudice” standard because, he- asserts, it is' ineffective per se to concedes defendant’s guilt without their consent. He contends that the Supreme Court’s holding in Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), does not govern the result here because the defendant in Nixon was informed of his attorney’s decision to concede guilt but failed to object to the attorney’s actions.
The' United States' Supreme Court in Nixon held that the presumed-prejudice standard did not apply when defense counsel conceded a defendant’s guilt in a capital-murder case without • the defendant’s express consent and that concession was part of defense counsel’s trial strategy. The Supreme Court held:
“To summarize, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant’s best interest and the defendant is unresponsive, counsel’s strategic choice is ■ not impeded by any blanket rule demanding the defendant’s explicit consent. Instead, if counsel’s strategy, given the evidence bearing on the defendant’s guilt, satisfies the Strickland standard, that is the end of the matter; no tenable claim of ineffective, assistance would remain.”
Nixon, 543 U.S. at 192.
As stated above, .trial counsel did not concede Walker’s guilt as to all charges *281 but conceded that Walker was guilty of burglary — á lesser-included offense of the capital-murder charge.
In discussing the holding in Nixon and its application to a situation in which an attorney fails to consult with a client before conceding the client’s guilt, the United States Court of Appeals for the Eleventh Circuit has stated:
“In [Florida v.] Nixon, [543 U.S. 175 (2004),] the Supreme Court maintained that ‘[a]n attorney undoubtedly has a duty to consult with the client regarding “important decisions,” including questions of overarching defense strategy.’ 543 U.S. at 187, 125 S.Ct. 551 (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); see also Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (‘From counsel’s function as assistant to the defendant derive ... the[ ] duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.’). From this, Darden contends that when- defense counsel doesn’t consult with his -or her client before strategically conceding guilt Cronic automatically applies.- Put another way, Darden contends that the result in Nixon would have been different had defense counsel not consulted with defendant before strategically conceding guilt.
“Darden - overreads Nixon’s dicta. The Court has never retreated from its holding in Cronic that only where defense' counsel -‘entirely fails to subject the prosecution’s case to meaningful adversarial testing,’ should prejudice be presumed. Nixon is no exception. There, the Court declined to apply Cronic because defense counsel’s strategic concession did not ‘rank as a “failure to function in any meaningful sense as the government’s adversary,” ’ notwithstanding defendant’s failure to consent to the strategy. Nixon, 543 U.S. at 190, 125 S.Ct. 551 (internal brackets omitted) (quoting Cronic, 466 U.S. at 666, 104 S.Ct. 2039). The Supreme Court’s emphasis' on whether defense counsel dutifully tested the government’s ease— -rather than defendant’s failure to consent — is a telling indication that while consultation with defendant is certainly among defense counsel’s duties, the dereliction of that duty does not automatically prejudice the defendant.
“Darden ignores all this. He contends' that under Nixon defense counsel’s failure to consult with defendant before strategically conceding guilt automatically triggers Cronic’s presumption-of-prejudice standard, even if defense counsel’s strategy to concede guilt was a reasonable, even excellent one. If we accept Darden’s contention we must also accept that Cronic can apply even in cases where defense counsel subjected the! government’s case to meaningful adversarial testing. Without further direction from the Supreme Court, we decline Darden’s invitation to expand what the Court intended to be a limited exception to Strickland — that applies only when the defehdant is actually or constructively denied effective assistance of counsel — into a broader, unintended exception.”
Darden v. United States, 708 F.3d 1225, 1232 (11th Cir.2013). See also Davenport v. Diguglielmo, 215 Fed.App’x 175 (3d Cir. 2007).
“Previous circuit court decisions have elaborated on this distinction between ineffective assistance of counsel and the constructive denial of counsel. Collectively, these decisions reinforce the notion that defense counsel must entirely fail to subject the prosecution’s case to *282 meaningful adversarial testing for the Cronic exception to apply. Gochicoa v. Johnson, 238 F.3d 278, 285 (5th Cir. 2000) (holding that ‘[w]hen the defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel’ (quoting Goodwin v. Johnson, 132 F.3d 162, 176 n. 10 (5th Cir.1997))). Thus, when analyzing an attorney’s decision regarding concession of guilt at trial, courts have found a constructive denial of counsel only in those instances where a defendant’s attorney concedes the only factual issues in dispute. See United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir.1991) (holding that ‘[a] lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to subject the prosecution’s case to meaningful adversarial testing’). In contrast, those courts that have confronted situations in which defense counsel concedes the defendant’s guilt for only lesser-included offenses have consistently found these partial concessions to be tactical decisions, and not a denial of the right to counsel. As such, they have analyzed them under the two-part Strickland test.”
Haynes v. Cain, 298 F.3d 375, 381 (5th Cir.2002).
Alabama follows the majority view and holds that it is not per se ineffective assistance for an attorney to partially concede a defendant’s guilt.
“ ‘Although Alabama has had little occasion to address whether counsel renders deficient performance by conceding guilt, we have held that it is not per se ineffective assistance for counsel to concede a client’s limited guilt.’ Taylor v. State, 10 So.3d [1037] at 1058 [ (Ala.Crim.App.2004) ]. See also Commonwealth v. Steele, 599 Pa. 341, 386, 961 A.2d 786, 812 (2008) (‘In [Florida v.] Nixon, [543 U.S. 175 (2004),] the High Court reiterated that [United States v.] Cronic, [466 U.S. 648 (1984) and the presumed prejudice standard] is limited to situations where counsel’s failure is complete, i.e., where “counsel has entirely failed to function as the client’s advocate.” ’); Sage v. State, 905 So.2d 1039, 1041 (Fla.App.2005) (‘[T]he defendant must show that counsel’s concession strategy was “unreasonable.” ’).”
Lee v. State, 44 So.3d 1145, 1169-70 (Ala.Crim.App.2009). Because the presumed-prejudice standard does not apply in this case — Walker was required to prove both prongs of the Strickland test.
Crespi testified at the postconviction evidentiary hearing that during closing argument in the guilt phase he conceded that Walker was guilty of burglary. Postconviction counsel did not ask Crespi why he made that concession. The only question asked of Crespi was whether Crespi had Walker’s consent to make that concession. Crespi testified that he had no specific recollection as to whether he had obtained Walker’s consent. (R. 83.) On cross-examination, Crespi testified that, based on Walker’s statements to him and one of Walker’s statements to police, it was his strategy to concede that Walker was guilty of burglary and that his code-fendant, Beckworth, instigated the entire course of events that led to Thweatt’s death. Walker admitted in a statement to police that he had participated in the burglary of Thweatt’s home.
“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statement or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the *283 defendant and on information supplied by the defendant.”
Strickland, 466 U.S. at 691.
Counsel made a strategic decision to concede Walker’s guilt on the burglary charge. “[D]efense counsel’s reasoned, strategic decision was. not outside ‘the wide range of reasonable professional assistance.’ ” Johnson v. State, 612 So.2d 1288, 1297 (Ala.Crim.App.1992), quoting Strickland v. Washington, 466 U.S. at 689. We agree with the circuit court that Walker failed to meet his burden of proof in regard to this claim and is, therefore, due no relief.
IV.
Walker next argues that his trial counsel were ineffective at the penalty phase'of his capital-murder trial. Specifically, he argues that counsel failed to show that Walker “suffered as a result of his abusive, unstable, and psychologically damaging family situation....” (Walker’s brief at p. 56.)
A.
Walker first makes a general argument that his trial counsel were ineffective for failing to conduct an adequate investigation into possible mitigation evidence and to present that mitigation evidence at the penalty phase.
The circuit court made the following findings concerning this claim:
“[Walker] claims that trial counsel did not devote sufficient time to prepare a mitigation investigation into the trial and thus, because of ‘these failures trial counsel entered the penalty phase of Mr. Walker’s trial unprepared to present a persuasively penalty phase defense that would have likely convinced the jury to spare Mr. Walker’s life.’ . ‘Although [Walker’s] claim is that his trial counsel should have done something more,, we first look at what the lawyer did in fact.’ Chandler v. United States, 218 F.3d 1805, 1320 (11th Cir.2000). First, Cres-pi testified that it was Mr. Hogg’s function primarily to handle the penalty phase; nevertheless, Crespi gathered records on Walker, made decisions on what documents would be admitted during this phase, and worked alongside Hogg during the penalty phase. Crespi also obtained funds to hire a mitigation investigator and retained a neuropsy-chologist to evaluate Walker.' [Walker] failed to prove the standard set out in Strickland, nor did he provide any evidence to support that the mitigation evidence outweighed the aggravators presented in his trial.
“[Walker] argues that mitigation investigator, Cheryl Pettry, was hired ‘nearly two and a half years after [trial counsel’s] appointment.’ ' However, [Walker] negates the fact that Pettry was hired nearly a year before [Walker’s] trial, which began in August of 2003.. [Walker] also argues failure of trial counsel to provide documents to Pettry in a timely manner, or to cooperate with the request of Pettry in obtaining and providing hér with records needed for the mitigation phase. Despite these allegations, Pettry was able to obtain [Walker’s] medical records, educational records, his mother’s arrest record arid juvenile records. In addition, Pettry spent approximately twenty-four hours interviewing [Walker] and another twenty-eight hours interviewing potential witnesses. Pettry was also able to interview correctional officers who had contact with [Walker]. The record reflects that although Pettry may not have received all the information she requested, she was able to gain a substantial amount of information to achieve ■ the role for which she was retained, a miti *284 gation investigator. Pettry was able to present [Walker’s] past obstacles through the details of his problematic background and life.”
(R. 2295-96.) The circuit court’s findings are supported by the record.
Crespi testified at the postconviction evi-dentiary hearing that he had hired Cheryl Pettry as a mitigation expert. He said that he had waited two years to hire her but that he did not have any particular reason for doing so. He said that he was in charge of the guilt phase and that Hogg was in charge of the penalty phase. On cross-examination, he testified that he had billed the State for 235 hours for the out-of-court work he did on Walker’s case. Hogg testified that he was responsible for the mitigation presentation and that their goal at sentencing was
“to show that [Walker’s] circumstances of his upbringing was unfortunate, and that he had no prior history of criminal activity. There were a list of mitigating circumstances we were trying to show through the witnesses who testified about his upbringing, and probably that he had done some good things, had a good impact on people along the way. He had worked for a period of time and had been a good employee.... ”
(R. 385.) During cross-examination, Hogg stated the following:
“[Assistant Attorney General]: I want to ask you a few questions about Cheryl Pettry, who I believe was the mitigation investigator in this particular case.
“[Hogg]: Yes.
“[Assistant Attorney General]: Could you explain what her role was on the Defense team in your opinion?
“[Hogg]: She- was to identify- potential mitigation witnesses and records, and then assist in - gathering those records and assist us in getting those witnesses to trial.
“[Assistant Attorney General]: Would it be fair to say that she did a lot of the actual groundwork of locating witnesses and gathering documents?
“[Hogg]: She did, to the best she was able to do. . ■
“[Assistant Attorney General]: Okay. And you had pretty good contact with Ms. Pettry in the weeks before trial, correct?
“[Hogg]: Yes.
“[Assistant Attorney General]: And did she provide you with documents detailing her investigation such as summaries of interviews and timelines of Walker’s life?
“[Hogg]: She did.
“[Assistant Attorney General]: I want to show you what has been previously admitted, as State’s 3. Would you také a look at that and tell me what that documents is?
“[Hogg]: This is a timeline that Ms. Pettry prepares. This is one that she prepared in this case—
“[Assistant Attorney General]: Okay.
“[Assistant Attorney General]: — showing the people who have had contact with
[Walker] during his life and the different institutions, hospitals, what have- you, where — schools, where he .has had contact.
[[Image here]]
“[Assistant Attorney General]: Did Ms. Pettry also suggest the order of mitigation witnesses, how they should occur in the penalty phase?
“[Hogg]: She probably did.
“[Assistant Attorney General]: Okay. I just , want to represent that you called five witnesses during the penalty phase of trial. I think the record will reflect that. Would it be fair to say that the five -witnesses you called in your opinion *285 would have had the best things to say about Walker that would have been consistent with your overall penalty phase strategy?
“[Hogg]: Yes. We would have called the best witnesses that we had, yes.”
(R. 386-90.) Hogg further testified that several potential mitigation witnesses were taken off the defense’s witness list because they were related to Beckworth and they were afraid that if they testified for Walker it would hurt Beckworth’s' case. The exhibits filed by the State show that Hogg billed the State for approximately' 190 hours for his out-of-court work- on Walker’s case. (C. 4174.) The itemization attached to Hogg’s attorney-fee'declaration shows that he spoke to several witnesses.
Cheryl Pettry testified that she was hired as a mitigation .expert to assist in Walker’s case in October 2002, that she asked for records from Crespi on several occasions, that she got medical records, juvenile records, and , school records in July 2003, that she informed Crespi about Walker’s school records, and that Walker had attended seven different schools before the seventh grade when he dropped out of school. Pettry testified that she thought certain records were important but that Crespi did not introduce any records at Walker’s trial. She spoke to Walker’s sister in person and to other relatives on the telephone. On cross-examination, Pettry testified that she- had billed the State for approximately 200 hours of work on Walker’s case, that she had-spent about 24 hours interviewing Walker, that she had spent about 28 hours talking to potential mitigation witnesses, and that, after she interviewed each individual, she sent a memorandum synopsis of the interview to counsel. The exhibits introduced by the State also show that Pettry spent 51 hours meeting with the attorneys and experts, that she spent 28 hours conducting interviews, that she spent 84 hours preparing documents, and that she billed the State for $14,997 for her work on Walker’s case.[7] Pettry compiled a-detailed 13-page time-line about Walker’s life^-a copy of which was forwarded‘to Walker’s attorneys. (C. 4157-69;)
This Court has recognized that an attorney may delegate his investigation to surrogates. In Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007), we stated:
“[W]hen discussing the duty to investigate mitigating evidence in Rompilla [v. Beard, 545 U.S. 374 (2005) ], Wiggins [v. Smith, 539 U.S. 510 (2003)], and Williams [v. Taylor, 529 U.S. 362 (2000) ], the Supreme Court did not expressly or impliedly hold that counsel must perform the actual investigation. Therefore, we conclude that the appellant’s trial attorneys did not render ineffective assistance when they relied on subordinates to conduct most of the mitigation investigation, communicated with them during the investigation, -and made the ultimate decision about what mitigation evidence to present.”
979 So.2d at 163.
“[I]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989). In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation. See Henderson *286 v. Sargent, 926 F.2d 706, 714 (8th Cir.1991).”
Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998).
This is not a case in which no investigation was conducted into Walker’s childhood and background. As stated above, an extensive investigation was conducted. We agree with the circuit court that Walker failed to establish that counsel’s actions were deficient; thus, he failed to satisfy the Strickland, test and is due no relief on this claim.
Moreover, “[although Petitioner’s claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.” Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000). “[I]t is best to begin with the evidence Petitioner actually presented in mitigation. ...” Lorraine v. Coyle, 291 F.3d 416, 427 (6th Cir.2002).
We have examined the record of Walker’s trial.[8] At the penalty phase, counsel presented the testimony of Angela Foster, Walker’s sister; David A. McCarn, Walker’s stepfather; Danny Ray McCord, Walker’s friend; Danielle Weeks, Walker’s friend; and Alina Wilhite, Walker’s former coworker.
Foster testified that she was Walker’s older sister, that she was like a mother to him because their mother was never at home, that Walker’s father was never around, that their mother had been married 5 or 6 times, that their mother would often bring men home with her and those men would beat her in Walker’s presence, that their mother married when Walker was about 4 years old, that they were left with their uncle and the uncle “tormented and scared” them, that Walker tried to establish a relationship with some of the men that his mother brought home but was not successful, and that when Walker was about 17 years old he was sent to Dothan to meet and live with his father’s family. It was in Dothan that Walker met his brother, Beckworth. Foster said that in 1998, when she returned to Dothan, Walker was living with his girlfriend and their daughter. Foster said that Walker was a good father and did everything for his daughter. She also testified that Walker had had a brain tumor wrapped around his brain stem and that after he had the tumor removed he was a changed person. She said that Beckworth was heavier in build than Walker, that Walker looked up to Beckworth, and that Beck-worth was the more aggressive of the two.
McCarn testified that he was Walker’s stepfather, that he married Walker’s mother in 1987 when Walker was around five years old, that he tried to raise Walker, that he divorced Walker’s mother in 1994, that Walker’s mother abused Walker, and that Walker’s mother’s conduct lead to their divorce.
McCord testified that Walker was a friend of his son’s, that when Walker had no home in 1990 he came to live in his house with this family and that Walker got a job and helped with the bills, that at that time Walker worked at Dothan Auto Auction, that he considered Walker his son, that Walker interacted with his children like they were siblings, that Walker frequently babysat his children, that he witnessed Beckworth and Walker in a fight because Walker would not go somewhere with Beckworth, that Walker had a daughter named Cherish, that Walker carried the child everywhere with him, that Walk *287 er called the child “my little angel,” and that Cherish loved Walker. McCord also testified that Walker’s mother and Beck-worth had a “sexual relationship.”
Weeks testified that she met Walker in 1998, that her husband worked with Walker at a steak house, that they socialized with Walker, that she moved in with Walker, that Walker was married and had a daughter named Cherish, that Walker yras a loving and attentive father, that Beck-worth was angry and withdrawn, and that Beckworth was the more dominant of the two.
Wilhite testified that she worked with Walker at Dothan Temporary Services in 1998 and 1999, that she had a lot of contact with Walker when he was working for the temporary service, that he always went to the job site when he was assigned a job, that Walker was a good worker and respectful, and that she enjoyed sitting and talking with Walker.
At the postconviction evidentiary hearing, Walker presented the testimony of Kathy Peters, Walker’s maternal aunt; McCarn; McCord; Chris Tudor, Walker’s former cell mate; and Wilhite.
Peters testified that Walker’s mother was her sister, that Walker’s mother was a violent person and would beat Walker’s sister in Walker’s presence, that Walker’s mother was married 5 or 7 times, that Walker’s mother’s first husband was abusive to her, that Walker’s mother did not take care of Walker’s basic needs, that Walker’s mother rievér showed Walker any affection, that at one time Walker’s mother tried to give Walker away, and that Walker’s mother would leave the kids at home alone.
McCarn testified that he married Walker’s mother when Walker was between three and five years of age, that she cheated on him on multiple occasions, that she would bring men to the house when he was away and the children were at home, that he would send her money for expenses, when he was away and that she would not pay the house bills, that he would physically discipline the kids, that he and Walker’s mother both drank alcohol, and that Walker’s mother did nothing around the house and did not take care of the children’s basic, needs.
McCord testified that Walker was his son’s friend when his son was about 17 years old, that Walker came to live in - his house when he found out that Walker was homeless and had been living outdoors, that he helped Walker get' a job, that Walker had to abide by his rules as long as he lived in his hou|e, that Walker had done his chores, that he thought of Walker as a son, that Walker was a hard worker, that Walker had contributed to the household expenses, that he trusted Walker' and had left his young children with him, that at one point Walker’s mother, and Walker’s stepbrother, Rex Beckworth, came in a trailer to visit Walker , and parked their trailer on his property, that Walker’s mother and stepbrother had been sleeping together, that Walker witnessed this and became upset, that Walker’s mother treated Walker like a dog, that Beckworth was not kind to Walker, that Walker was afraid of Beckworth, that Walker changed when his mother and stepbrother came around, and that Walker left his home to live with his mother and stepbrother.
Tudor testified that he met Walker when they were both incarcerated at the Houston County jail in 1997, -that he and Walker became friends, that when he .was released he went to live with the McCords, that Walker paid for his meals, that Walker was a good father, that Walker kept him out of trouble after he got out of jail, that Walker helped people, that he met Walker’s mother and she did not treat *288 Walker Well, that Beckworth treated Walker “like a piece of dirt,” that Beck-worth was a bully, and that he was shocked to hear that Walker- had been convicted of capital murder because it was not consistent with Walker’s character.
Wilhite testified that she had worked with'Walker at Dothan Temporary Services’ in 1998, that Walker was a hard worker, that she had never received any complaints about Walker, that Beckworth had worked for Dothan Temporary Services on several occasions, that Beckworth was not a good worker, that Beckworth had a “nasty attitude,” and that Walker was easily influenced.
Although “[t]here'has never been a casé where additional witnesses could not have been called,” State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993), “there comes a p'oint at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.” Bobby v. Van Hook, 558 U.S. 4, 11, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009). See also Jalowiec v. Bradshaw, 657 F.3d 293, 319 (6th Cir.2011) (“[F]ailing to intro-düce additional mitigation evidence that is only cumulative of that already presented does ' not amount to ineffective assistance.”); Jones v. State, 998 So.2d 573, 586 (Fla.2008) (“We have repeatedly held that counsel is not ineffective for failing to present cumulative evidence,”); Coble v. Quarterman, 496 F.3d 430, 436 (5th Cir. 2007) (“The decision not to present additional testimony does'not constitute ineffective assistance of counsel.”-); and Clark v. Mitchell, 425 F.3d 270, 286 (6th Cir. 2005) (“Counsel is not required to call additional witnesses to. present redundant or cumulative evidence”).
“Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir.1990). Rather, the deciding factor is whether additional witnesses would have made any .difference in the mitigation phase of the trial.”
Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000).
The mitigation evidence that was presented at Walker’s postconviction hearing was in large part cumulative of the mitigation evidence that had been presented at Walker’s penalty-phase hearing. Indeed, three witnesses—McCarn, McCord, and Wilhite—who testified at the postcon-viction hearing also testified at Walker’s sentencing hearing. Thése witnesses- did offer more detailed testimony at the post-conviction hearing. However, “a claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.” Frances v. State, 143 So.3d 340, 356 (Fla.2014).
“In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine. confidence in the outcome.’ Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
Here, when sentencing Walker to death the circuit court found that two ag *289 gravating circumstances were present: that the murder was committed during the course of a burglary and that the murder was especially heinous, atrocious, or cruel as compared to. other capital murders. The circuit court found the presence of three statutory mitigating circumstances: that Walker did not have a significant history or prior criminal activity, that Walker acted under the domination of another person, and that Walker was 20 years of age at the time of the murder. In regard to nonstatutory mitigating circumstances,- the circuit court found:
“[Walker] was reared in a single parent home with little relationship with his father. His mother was rarely home. When the mother was home she would bring different men with her. Defendant Walker often saw his mother being beaten by different men. His mother was married five to seven different times. He had an uncle who would mistreat him. Walker was also diagnosed with a brain tumor wrapped around his brain stem, according to his sister. [Walker] was a good father to his daughter and a loving father. His daughter loved him.
“There were altercations between co-defendant Beckworth and Walker. Beckworth was larger and more dominant. [Walker] gave a confession and showed law enforcement officers the crime scene.”
(Trial C. 354.)
After reviewing the omitted mitigation evidence and the mitigating evidence that was presented and considered at the penalty phase of Walker’s trial, we are confident that the omitted mitigation evidence would have had no impact on the jury’s decision to recommend that Walker be sentenced to death. See Wiggins. We hold that the circuit court did not err in denying relief on this claim.
1.
Walker next argues that his trial counsel were ineffective for failing to adequately collect records related to Walker’s life. Specifically, Walker argues in his brief to this Court that his trial counsel failed to collect criminal records of Walker’s family and that other records were not collected in a timely manner.
The circuit court made the following findings of fact on this claim:
“[A]ll relevant records containing medical, juvenile, and educational information [were] obtained and proved to be adequate for a mitigation investigation. [Walker] argues that trial counsel should have went further in obtaining information from [Walker’s] caregivers and relatives to understand [Walker’s] troubled family history, [Walker] overlooks the fact that this very information was elicited during the penalty phase[:] [Walker’s] sister testified that their mother brought drug addicts and alcoholics around Walker; she testified, that their mother was never home[] and how Walker witnessed physical altercations between his mother and her men; she also testified how other family, members mistreated Walker. Lastly, [Walker] has failed to prove how his trial .counsels’ performance was deficient under Strickland [v. Washington ], 466 U.S. [668] at 697 [ (1984) ], Ala. R.Crim. P. 32.3, and even more how these ‘relevant’ documents would have resulted in a different outcome in his trial. [Walker’s] claims of instances that happened prior to his birth are irrelevant to his life and the issue before the Court'. [Walker] relies on the notion that trial counsel did not obtain family members’ medical records .., to assist in diagnosing him with a mental (genetic) illness. However, Walker was not diagnosed with a mental illness, but only depression and anxi *290 ety[;] thus, this evidence would not be helpful in diagnosing [Walker] with a mental illness.”
(C. 2296-97.)
At the postconviction hearing, Crespi was asked no questions about his collection of records in relation to Walker’s case. Hogg testified' that he did not know what records Crespi had collected and that no records were admitted at the penalty-phase because, he said, some records were “deemed unsuitable” and some could not be introduced. (R. 822.) Pettry testified that she did receive Walker’s medical records, juvenile records, and school records but not at the time that she had requested them. Pettry said that she advised Crespi that Walker’s juvenile records should be introduced but that Crespi did not want them introduced.
The record of Walker’s trial shows that Crespi moved for access to Walker’s jail records while he was incarcerated at the Houston County jail and that that motion was granted. (Trial C. 197 and 208.) Counsel also moved for access to Department of Human Resources records related to Walker’s immediate family that were in Geneva, Tallapoosa, Talladega, Clay, Coo-sa, Calhoun, and Etowah Counties, and that motion was granted as it related to Geneva, Coosa, Tallapoosa, Talladega, Calhoun, and Etowah Counties. (Trial C. 254 and 256.) Counsel also moved for access to Walker’s juvenile records in Talladega County, arid that motion was granted. (Trial C. 257 and 260.)
We agree with the circuit court that Walker failed to establish either prong of the Strickland standard and is due no relief on this claim.
2.
Walker further argues that his trial counsel were ineffective for failing to identify and interview several witnesses who could have testified in mitigation at the penalty phase. Specifically, he argues that his trial counsel should have interviewed Kathy Peters, Walker’s maternal aunt; Lenore Hartzog, Walker’s case manager while Walker was at Mt. Meigs juvenile-detention facility; and Chris Tudor, a former cell mate of Walker’s while the two were incarcerated at the Houston County jail.
The circuit court stated the following concerning this claim:
“Kathy Peters’s testimony was similar to the testimony given by [Walker’s] sister Angela Foster. Ms. Peters testified that: Walker did not know or see his father as a child, the treatment of Walker’s mother as a child and abuse of Walker’s grandmother, promiscuity of Walker’s mother, and treatment received by Walker from his mother. [Walker] has failed to prove how this cumulative testimony would have caused a different outcome in his trial, nor how he was prejudiced under Strickland.
[[Image here]]
“Tudor’s testimony showed that his interactions ceased upon Tudor’s release (1998 or 1999) from jail. Tudor testified to good deeds of Walker (breaking up a fight, helping Tudor find housing, providing bond) and how Walker’s family treated him. Tudor’s testimony would have offered very little, if any help during the penalty phase, and [Walker] does not offer any evidence to the contrary.
[[Image here]]
“If [Walker’s] juvenile records had been introduced during the penalty phase, the jury would have become aware [Walker] had committed criminal offenses of assault second and two counts of breaking and entering an automobile. Trial counsel’s decision not to introduce [Lenore Hartzog’s testimony] was reasonable, particularly when *291 [Walker’s] crimes as a juvenile are similar to the crime that is before the Court today.” ■
(C. 2297-2301.)
At the postconviction hearing, neither Crespi nor Hogg were asked any questions about the three above-named witnesses. Hogg’s attorney-fee declaration does indicate that he contacted Hartzog. Pettry testified that she tried to interview Peters but could not locate her. (R. 240.) “[Wjhere the record is incomplete or unclear about [counsel's actions, we will presume that- he did what he should, have done, and that he exercised reasonable professional judgment.” Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000).
Moreover, “[t]he ’ fact that there were other witnesses' available who could have testified ... does not demonstrate that counsel was’ ineffective in choosing the theory and strategy that was presented at the penalty phase.” Barnhill v. State, 971 So.2d 106, 116 (Fla.2007). “[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative.” Day v. Quarterman, 566 F.3d 527, 538 (5th Cir.2009). “Whether to present certain testimonial evidence is a matter of trial strategy, and complaints of uncalled wit-’ nesses are generally disfavored.” Sanders v. United States, 314 Fed.App’x 212, 213 (11th Cir.2008).
Furthermore, Walker established no prejudice. Peters testified at the postcon-viction hearing that Walker’s mother was her sister, that Walker’s mothér was. a violent person and would beat Walker’s sister in Walker’s presence, that Walker’s mother was married 5 or 7 times, that Walker’s mother’s first husband was abusive to her, that Walker’s mother did not take care of Walker’s basic: needs, that Walker’s mother never showed Walker any affection,, that at one time Walker’s mother tried to give Walker away, and that Walk•er’s mother would leave the kids at home alone.
Hartzog testified that before he retired he was a psychological associate at Mt. Meigs juvenile-detention facility and that he .was Walker’s case manager when Walker was at that facility in 1997. He testified that he met with Walker once a week, that Walker performed excellently in the facility programs, that Walker obtained his GED while incarcerated, that Walker’s conduct was good while he was incarcerated at Mt. Meigs, and that Walker responded well to a structured environment,
Tudor testified that he met Walker when they were both incarcerated at the Houston County jail in 1997, that he and Walker became friends, that when he was released he went to live with the McCords, that Walker paid for his meals, that Walker was a good father, that Walker kept him out of trouble after he got out of jail, that Walker helped- people, that he met Walker’s mother and she did not treat Walker well, that Beckworth treated Walker “like a piece of dirt,” that Beck-worth was a bully, and that he was shocked to hear that Walker’• -.had been convicted of capital murder because it was not consistent with Walker’s character.
Peters’s testimony was -in large part cumulative to testimony that had been presented at the penalty phase of Walker’s trial. Hartzog’s testimony would have opened the door to testimony concerning Walker’s juvenile record. Pettry .testified that Crespi was aware of Walker’s juvenile records and did not want to present them at the penalty phase. Tudor’s testimony would have had no impact on the jury’s *292 verdict and, in.-part, was cumulative to testimony that was presented at Walker’s sentencing hearing.
For these reasons, the circuit court correctly found that Walker failed to satisfy the Strickland standard in regard to this claim, and, therefore, Walker is due no relief. .
3.
Walker further argues that counsel were ineffective for failing to preparé the penalty-phase witnesses that were called to testify at Walker’s sentencing hearing. Specifically, he argues that if David McCarn, Alina Wilhite, and Danny McCord had been- adequately prepared they could have provided additional information about Walker’s troubled background and his good character.
“Even the failure to interview witnesses -does not itself establish inadequate preparation.... It must be shown that the-failure resulted in counsel’s ignorance of valuable evidence which would have substantially benefitted the accused.” People v. Caballero, 184 Mich.App. 636, 642, 459 N.W.2d 80, 82-83 (1990). “The defense decision to call or not call a mitigation witness is a matter of trial strategy.... Likewise, the scope of questioning is generally a matter left to the discretion of defense-counsel.” State v. Elmore, 111 Ohio St.3d 515, 532, 857 N.E.2d 547, 566-67 (2006).
The majority of McCarn’s, Wil-hite’s, and McCord’s testimony at the post-conviction hearing was consistent -with their trial testimony. All- three did offer more detailed testimony at the postconviction hearing. At that hearing, McCarn gave a -more detailed account of his relationship with Walker’s mother; Wilhite testified that Beekworth also worked with her at Dothan Temporary Services and that he had a “nasty attitude”;, .and McCord gave a more detailed account of Walker’s good character and about Walker’s relationship with his mother and stepbrother.
“ ‘ “[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.” Nields v. Bradshaw, 482 F.3d 442, 454 (6th. Cir.2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006)).’ Eley v. Bagley, 604 F.3d 958, 968 (6th Cir.2010). ‘This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.’ United States v. Harris, 408 F.3d 186, 191 (5th Cir.2005). ‘Although as an afterthought this [defendant’s father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.’ Darling v. State, 966 So.2d 366, 377 (Fla.2007).”
Daniel v. State, 86 So.3d 405, 429-30 (Ala.Crim.App.2011).
Counsel’s manner of questioning the witnesses who testified at the penalty phase of Walker’s trial was a matter of trial strategy, ánd counsel’s failure to elicit more detailed testimony did not constitute ineffective assistance of counsel. The circuit court correctly found that Walker is due no relief on this claim.
B.
Next, W^ker argues that his trial counsel were ineffective for failing to procure an expert clinical psychologist to testify in mitigation at the penalty phase of Walker’s trial.
The circuit court made the following findings regarding this claim:
*293 “[Walker] contends that Dr. Catherine Boyer, an Alabama licensed clinical psychologist, should have been presented as an expert witness to provide the jury with a synopsis of [Walker’s] behavior, mental, and emotional health. Dr. Boyer provided testimony that there were no set risk factors to predict criminal behavior, and these factors only point to likelihoods but are not predictive in nature. Even more damaging, Dr. Boyer testified that many people are exposed to risk factors, but do not commit crimes. After being addressed by the Court Dr. Boyer could only diagnos[e] [Walker] with anxiety disorder and depression. Dr. Boyer’s, testimony was speculative at best because she did not administer the Trauma Symptom Inventory test in its standardized accepted form. Lastly, [Walker] does .not meet the standard set forth in Strickland, 466 U.S. at 687, by showing how he was prejudiced by his trial counsel’s deficient performance.”
(C. 2300.)
The record of Walker’s trial shows that, in October 2002, Crespi moved for. funds to hire Dr. Michael Passler, a neu-ropsychologist, to conduct a mental examination on Walker. (Trial R. 167.) The circuit court granted that motion in the “initial amount of $5,0Q0.” ■ (Trial C. 188.) Crespi was asked no questions - about this expert. . Hogg testified that he was aware that Crespi had communicated with Dr. Passler — whom Hogg described as a clinical and forensic psychologist. Pettry also testified that Crespi retained, Dr. Passler, but, she stated, she was not aware of his “final findings.” A copy of a memo sent to Crespi from Pettry states: “Have you spoken to Dr. Passler about the additional tests he has administered to James?” (C. 2398.) Because Crespi was asked no questions ■ concerning Dr,. Passler, we do not know the substance of any findings that Dr. Passler, might have made concerning Walker’s mental health. “[C]ounsel can make.a tactical decision not to present a psychologist’s testimony at the penalty phase.” Jackson v. Bradshaw, 681 F.3d 753, 771 (6th Cir.2012). “[T]he [Supreme] Court has never stated as a per se. rule that a particular-type of mental health expert is required in death penalty cases.” Carter v. Mitchell, 443 F.3d 517, 526 (6th Cir.2006). What is clear is that Dr. Pas-sler spoke with Walker, and that Crespi communicated with Dr. Passler. It appears that Crespi was aware of Dr. Pas-sler’s findings and opted not to present those findings at the penalty. phase of Walker’s trial.
“[W]e have no evidence as to whether trial counsel investigated additional experts,, or why trial counsel chose not to •offer additional experts. ‘An ambiguous or silent record is not sufficient to disprove the strong .and continuing presumption , of counsel’s - competency. Therefore, where the . record is incomplete or..unclear about. [counsel]’s actions, we will , presume that he did what he,should have done,, and that he exercised reasonable professional judgment.’ Chandler v. United States, 218 F.3d [1305] at 1314 n. 15 [(11th Cir.2000)] (alteration in original), (citation and quo- • tation marks omitted). Because Williams has offered no evidence to support a conclusion that, trial counsel failed to conduct an investigation into additional experts, we presume Williams’ trial counsel exercised reasonable, professional judgment.”
Williams v. Allen, 598 F.3d 778, 794 (11th Cir.2010). “To find that trial counsel was ineffective based on the asserted grounds would call, for speculation, which we will not do.” Pieringer v. State, 139 S.W.3d 713, 720 (Tex.App.2004).
*294 Moreover, Walker failed to satisfy the prejudice prong of the Strickland, test. At the postconviction evidentiary hearing, Walker presented the testimony of Dr. Katherine Boyer, a clinical and forensic psychologist. Dr. Boyer stated that she evaluated Walker for the postconviction proceedings and that it was her opinion that Walker had an anxiety disorder and was depressed. She testified that she had administered the Trauma Symptoms Inventory test to Walker in order to make those determinations. The following occurred:
“[Postconviction counsel]: In administering this test, did you follow a standard instruction?
“[Dr. Boyer]: I did not. The test instructions — the individual is asked to answer the items in terms of how — what they experienced in the prior six months. Mr. Walker is obviously, you know, in prison now. It’s some years prior — I mean since the crime he was arrested for, and in — for my purpose in this, the evaluation was to not understand how he functions now, not that that isn’t important, you know, to know about in consideration of diagnostic issues over time, but I was really interested in the impact of his risk factors on his psychological development in the period prior to the crime. And so I asked him to complete the test, responding to the items in terms of how he felt, how these affect — you know, how these apply to him in the six months prior to his arrest.”
(R. 768.) She then admitted: “The most likely impact of doing that is that Mr. Walker’s memory of his symptoms may not be as, you know, exhaustive or as fresh or as clear as they were at the time.” (R. 769.) The documents submitted by Walker at the postconviction hearing also show that Walker had a full-scale IQ of 99.
Dr. Boyer did not testify that Walker had any mental illnesses. We agree with the circuit court that the exclusion of Dr. Boyer’s testimony did not result in any prejudice to Walker and that Walker is due no relief on this claim.
C.
Walker argues that his trial counsel were ineffective for failing to retain a forensic expert to disprove the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. He argues that Dr. Alfredo Paredes’s testimony was critical to this issue because he testified that “the victim was alive and possibly conscious at the time she was shot and while blunt force trauma occurred, and that she suffered a great deal of ‘deep’ pain after nine separate blows.” (Walker’s brief at p. 77.)
The circuit court stated the following concerning this claim:
“[T]rial counsel testified that he did not feel it would be necessary to hire a forensic pathologist on the defense side, because he felt that it would not be an issue as to how the victim died. This was trial counsel’s reasonable professional decision; furthermore, [Walker] is not entitled ‘[to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonable likely to render ... effective assistance.’ Hunt v. State, 940 So.2d 1041, 1059 (Ala.Crim.App.2005) (quoting Thompson v. State, 615 So.2d 129, 134 [(1992)]). Trial counsel also had an opportunity to cross-examine State’s witness Dr. Parades, in which he conceded that he could not explicitly say the injuries the victim received did not render her unconscious. Thus, ‘the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.’ Davis v. State, [44 *295 So.3d 1118 (Ala.Crim.App.2009) ]. The testimony offered by [Walker’s] forensic expert (Dr. Spitz) was similar to the testimony offered by State’s expert Dr. Parades, the major difference between the testimonies was the number of injuries the victim received.”
(C. 2290-91.)
At the postconviction hearing, the following occurred during Crespi’s testimony:
“[Postconviction counsel]: And do you recall the aggravating factors that the State argued in Mr. Walker’s case?
“[Crespi]: Certainly they relied on the fact that this was a — an intentional— their contention was it was intentional killing committed in the course of a burglary. And the Court determined that was made out as a matter of law by the guilty verdict on the charge of capital murder. And then I believe they' also relied on this being a heinous, atrocious, and cruel killing, which I don’t have a recollection of any other aggravating circumstances that — that they argued.
“[Postconviction counsel]: With regard to the Government’s contention, that the murder was unusually cruel or heinous—
“[Crespi]: Yes, sir.
“[Postconviction counsel]: — do you recall the testimony for the State of Dr. Alfred Paredes?
“[Crespi]: Dr. Alfredo. Paredes, yes, I do. In general terms.1
“[Postconviction counsel]: And was he an expert or a lay witness?
“[Crespi]: He was an expert witness. He was a forensic pathologist — I believe that was still during the time — well, I’m not sure whether he was employed at. that time by the Department of Forensic Science or doing contract work.
“[Postconviction counsel]: Do- you recall in general the content of his testimony at trial?
“[Crespi]: I — well, I remember his testifying that this was — that this was a homicide, and that the forensics — the forensic indications were that Ms. Thweatt had been both shot and severely beaten. “[Postconviction counsel]: Do you recall whether the Government used his. testimony as a basis to argue that killing had, in fact, been cruel and heinous?’ “[Crespi]: Yes, sir. To my recollection they did.
“[Postconviction counsel]: Now, were you aware prior to trial that Dr. Paredes would be testifying?
“[Crespi]: Yes, sir.
“[Postconviction counsel]: -And did you hire a forensic pathologist to help you prepare for that testimony and to then rebut his testimony with the Defense’s own expert testimony?
“[Créspi]: No, I did not.
“[Postconviction counsel]: Was it a strategic decision not to hire a forensic pathologist on the Defense side?
“[Crespi]: At the time I didn’t feel — I didn’t feel that it would be necessary to do that.
“[Postconviction counsel]: Why is that? “[Crespi]: I didn’t-ras to the — as to the issue of — I didn’t expect there to be an issue as to how Ms. Thweatt died. And I was looking — I was looking at. the hiring of a forensic.pathologist in that rather narrow context.”
(R. 83-85.) On cross-examination, Crespi testified that he was able to elicit from Dr. Parades that he could not say to a medical certainty that Thweatt was conscious when she, received the majority of her injuries. (R. 107-09.) The following occurred:. .
“[Assistant Attorney General]: So you were able to point out that — or elicit *296 from Dr. Paredes there was no defensive injuries on the'Victim?
“[Crespi]: That’s correct.
■“[Assistant Attorney General]: Would you not agree that the purpose of this questioning would be to rebut ■ the State’s theory, that Mrs. Thweatt was conscious during the attack?
“[Crespi]: Yes, sir.
“[Assistant Attorney General]: And the .purpose of that would be, if she was unconscious, this would tend to negate argument during the penalty phase of the crime that she was able to feel pain and, therefore, the crime was heinous, atrocious, and cruel,.correct?
“[Crespi]: That is correct.”
(R. 109-110.)
At the postconviction.hearing, Walker presented the testimony of Dr. Daniel Spitz, chief medical examiner for St. Clair County in the State of Michigan. Dr. Spitz stated that- he had reviewed the autopsy report, the autopsy photographs, the coroner’s report, and various other documents related to Thweatt’s death. Dr. Spitz disagreed with the number of blunt-force blows that had ..been inflicted on Thweatt but agreed that the cause of death was a gunshot wound to her head. Dr. Spitz said: “It’s my conclusion that Mrs. Thweatt would have been certainly in an altered state of consciousness, 'and likely unconscious very shortly after the — one of the first three blows and involved and front surface of her face arid — and—forehead.”' (R. 175.) He disagreed with Dr. Paredes testimony that Thweatt would have been in deep pain. Dr. Spitz said: “[W]hile I agree that there would have potentially been pain following the first impact, I think it would have been very short-lived because of the onset of unconsciousness, such that any subsequent blow would have^ been while she was in a state of — unable to sense additional pain, up until the exact time when her heart no longer beat.” ■ (R. 180-81.). ■
“ ‘[H]ow to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forgo cross-examination and/or to forgo development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.’ ”
Daniel v. State, 86 So.3d 405, 426 (Ala.Crim.App.2011), quoting Thomas v. State, 284 Ga. 647, 650, 670 S.E.2d 421, 425 (2008). “ ‘The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.’ ” Greiner v. Wells, 417 F.3d 305, 323 (2d Cir.2005), quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir.1998). “An attorney’s decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy.” People v. Payne, 285 Mich.App. 181, 190, 774 N.W.2d 714, 722 (2009). “[I]n general, the ‘decision not to hire experts falls within the realm of trial strategy.’” State v. Denz, 232 Ariz. 441, 445, 306 P.3d 98, 102 (2013), quoting Yohey v. Collins, 985 F.2d 222, 228 (5th Cir.1998).
Counsel’s decision not to call a defense expert but instead to rely on cross-examining the State’s expert was a matter of trial strategy that the circuit .court and this Court will not second-guess. See Johnson v. State, supra. Walker is due no relief on this claim.
V.
Walker next argues that his attorney at the judicial sentencing hearing and on direct appeal, Charles Decker, was ineffective.
*297 The circuit- court made the following findings concerning this claim:
“These claims made against Mr. Decker are meritless because [Walker] failed to present any relevant .testimony of Decker during the evidentiary , hearing. In addition, [Walker’s] own post-conviction counsel noted, ‘[w]e can’t prove [ineffective assistance of counsel] because Mr. Decker is unavailable.’ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation],’ Chandler [v. United States ], 218 F.3d [1305] at 1314 n. 15 [ (11th Cir.2000) ], thus Decker’s performance is, presumed to be effective and this claim and its sub-parts are denied.”
(C. 2303.)
A. '
Walker argued at the conclusion of the postconviction hearing that he could not prove ineffective assistance of counsel as it related to .attorney Decker because, he said, Decker was not available to testify. As we previously stated, the parties stipulated that Decker’s medical condition made it impossible for him to testify at the post-conviction hearing.
This Court has held that the unavailability of an attorney does not warrant modifying the Strickland test. Indeed, in Hunt v. State, 940 So.2d 1041 (Ala.Crim.App. 2005), this Court held that the death of an attorney did not relieve postconviction counsel of satisfying the Strickland test when raising a claim of ineffective assistance of counsel. We stated:
“Hunt was represented at trial by attorneys Hubert Taylor and Louis Wilkinson. Both attorneys were deceased at the time of the Rule 32 proceeding. We have conducted a diligent search and can find no case where the death of a petitioner’s trial counsel before a post-conviction hearing relieved the petitioner of complying with the requirements of Strickland [v. Washington, 466 U.S. 668 (1984) ]. See Fults v. State, 274 Ga. 82, 548 S.E.2d 315 (2001), cert. denied, 535 U.S. 908, 122 S.Ct. 1210, 152 L.Ed.2d 148 (2002) (court applied Strickland after noting that attorney was deceased); King v. State, 808 So.2d 1237 (Fla.2002) (court applied test in Strickland although attornéy was deceased and could not testify); Hauck v. Mills, 941 F.Supp. 683 (M.D.Tenn.1996) (court applied Strickland to claims of ineffective assistance of counsel .even though attorney was deceased). In fact, some courts have noted that ‘the fact that a petitioner’s trial counsel is deceased may in fact prejudice the Government’s ability to respond to the petitioner’s claims’ and those courts have dismissed habeas corpus actions raising ineffective-assistance-of-counsel claims. Slevin v. United States, 71 F.Supp.2d 348, 358 n. 9 (S.D.N.Y.1999), citing Honeycutt v. Ward, 612 F.2d 36, 41-43 (2d Cir.1979).
“ ‘In several cases, courts have failed to find that a prisoner sustained the burden of proof on a claim of ineffective counsel raised in connection with a guilty plea when the prisoner could- only offer his uncorroborated testimony as to actions of his attorney and the attorney was deceased.’ .
“United States v. McFarlane, 881 F.Supp. 562, 569 (M.D.Fla.1995).
“Therefore, we- apply the standard of review set out by the United States Supreme Court in Strickland to the claims of ineffective assistance of counsel presented in this case.”
Hunt, 940 So.2d at 1060.
Our neighboring State of Georgia, in Schofield v. Meders, 280 Ga. 865, 632 S.E.2d 369 (2006), stated:
*298 “We remind bench and bar that while it may represent a hardship to petitioner, the intervening death of a habeas petitioner’s trial attorney does not excuse a petitioner’s inability to produce ‘objective evidence’ in support of his allegations .... While unfortunate, because the death of a petitioner’s trial counsel is just as, if not more, likely to prejudice the respondent, it does not relieve the petitioner of his ‘heavy burden’ of proving ineffective assistance.”
280 Ga. at 867 n. 2, 632 S.E.2d at 373 n. 2.
Therefore, this Court applies the standard announced by the United Supreme Court in Strickland v. Washington to Walker’s claims that attorney Decker’s performance was ineffective.
B.
Walker argues that Decker was not prepared for the sentencing hearing, that he failed to investigate certain matters, and that he failed to object to certain evidence. “We ‘cannot infer a defense failure to investigate from a silent record.”” State v. Perez, 124 Ohio St.3d 122, 156, 920 N.E.2d 104, 139 (2009). “[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer.” Brooks v. State, 456 So.2d 1142, 1145 (Ala.Crim.App.1984). We agree with the circuit court that Walker failed to meet his burden of proof in regard to this claim and is, therefore, due no relief.
C.
Walker next argues that Decker was ineffective on direct appeal because, he says, Decker failed to raise certain issues in his brief on direct appeal.
“Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.” Jones v. Barnes, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Walker argues in his brief to this Court that Decker was ineffective for failing to raise the following issues on direct appeal: (1) that the evidence was insufficient to convict Walker of capital murder; (2) that the State erroneously relied on inconsistent theories in Walker’s and Beckworth’s cases;[9] (3) that the statutory cap on attorney fees in Alabama rendered his counsel’s performance ineffective; and (4) that the court’s jury instructions on accomplice liability were erroneous. None of those four claims would have entitled Walker to relief on appeal. “Because the substantive claim[s] underlying the claim of ineffective assistance of counsel [have] no merit, counsel could not be ineffective for failing to raise [these] issue[s].” Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009). Walker is due no relief on this claim.
D.
Walker last argues that the circuit court erred in excluding additional evidence indicating that Decker’s performance was deficient. Specifically, Walker argues that the circuit court erred in excluding documents from the Alabama State Bar that related to disciplinary actions, in unrelated cases involving Decker and documents related to a neurological injuiy that Decker suffered in 2006. The following occurred at the conclusion of the post-conviction hearing:
*299 “The Court: You, I think, are going to imply that somehow there was ineffective assistance of appellate counsel, and you’ve introduced a number of documents here, all of which, postdate the opinion from the Court of Criminal Appeals, October the 1st, 2004. The disciplinary action here, all that came after this appeal, as I recall.
[[Image here]]
“The Court: Unless somehow you can, you know, indicate to the Court how it affects this particular case. I mean, it’s just—
“[Postconviction counsel]: Well, Your Honor, if—
“The Court: It’s character assassination essentially, you know;. It’s something that—
“[Postconviction counsel]: Your Honor, I — we’re not in any way attempting to— we have in our claim — in our petition claim ineffective assistance of counsel against Mr. Decker. We can’t prove that because Mr. Decker is unavailable. The best evidence that we have are the official records from the Alabama Bar. If you look at the—
“The Court: But those — but those records postdate—
[[Image here]]
“The Court: Character — it’s kind of like character evidence, you know, that somehow he was having these problems and therefore acted in accordance with that — with respect to your, client. I don’t — I don’t know. Kind of like wanting to introduce two other burglary convictions to show that he committed this burglary. It’s the same — I mean, it’s the same situation. Okay. .
“[Postconviction counsel]: The stipulation admitted then, 124?
“The Court: The stipulation is. Yeah, the stipulation itself is. These other documents are not.”
(R. 798-800.) The" circuit court did not allow the documents to be admitted after finding that the documents postdated Decker’s actions in Walker’s case.
“The fact that [an attorney] may have been ineffective in other matters does not direct the conclusion that he was ineffective here.” Lin v. Holder, 630 F.3d 536, 546 (7th Cir.2010). “[M]erely because [a lawyer] is subject to disciplinary proceedings while representing a client does not mean that he is presumptively incapable of providing effective assistance.” Young v. Runnels, 435 F.3d 1038, 1043 (9th Cir.2006). “[T]he mere fact that an attorney faces pending disciplinary proceedings does not render him' or her incompetent to defend a person charged •with a crime.” People v. Gilbert, 370 Ill.Dec. 825, 832, 989 N.E.2d 213, 220 (2013).
Accordingly, we find no reversible error in the circuit court’s exclusion of documents unrelated to Decker’s actions in Walker’s case.
VI.
Walker next argues that the cumulative effect of his allegations of ineffective assistance of counsel entitle him to a new trial.
“Other states and federal courts are not in agreement as to whether the ‘cumulative effect’ analysis applies to Strickland claims. As the Supreme Court of North Dakota noted in Garcia v. State, 678 N.W.2d 568, 578 (N.D.2004):
.“‘Garcia argues that even if trial counsel’s individual acts or omissions are insufficient ‘ to establish he was prejudiced, the cumulative effect was substantial enough- to meet Strickland’s test. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir.1995) *300 (“In making this showing, a'petitioner may demonstrate that-the cumulative effect of counsel’s individual acts or omissions was substantial enough to meet Strickland’s test”); but see Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (“cumulative error does not call for habeas relief, as each habeas .claim must stand or fall on its own”).’
“See also Holland v. State, 250 Ga.App. 24, 28, 550 S.E.2d 433, 437 (2001) (‘Because the so-called cumulative error doctrine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of Strickland v. Washington.’ (footnote omitted)); Carl v. State, 234 Ga.App. 61, 65, 506 S.E.2d 207, 212 (1998) (.‘Georgia does not recognize the cumulative error rule.’); Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir.1998) (‘Not surprisingly, it has long been the practice of this Court to individually assess claims under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4tH Cir. 1986) (considering ineffective assistance claims individually rather than considering their cumulative impact.).’).
“We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel. However, the Alabama Supreme Court has held that the cumulative effect of prosecutorial misconduct necessitated a new trial in Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988) (We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights- of the defendant and seriously affected the fairness and integrity of the judicial proceedings.’). Also, in Ex parte Bryant, 951 So.2d 724 (Ala.2002), the Supreme Court held that the cumulative effect of errors may require reversal.
“If we were to evaluate the cumulative effect of - the ineffective assistance of counsel claims, we would find that Brooks’s substantial rights were not injuriously affected. See Bryant and Rule 45, Ala. R.App. P.”
Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005).
Like in Brooks, if we were to evaluate the cumulative effect of the claims of ineffective assistance of counsel, we wo.uld find that Walker’s substantial rights were not injuriously affected. Thus, we find no cumulative error.
VII.
' Walker next argues that the circuit court erred in excluding the testimony of Dr. Richard A. Leo, an expert in the field of police-interrogation tactics or “false confessions,” at the postconviction evidentiary hearing;
The record shows that Walker alleged in his fourth amended postconviction petition that his trial' counsel were ineffective for failing to secure an expert like Dr. Leo to testify concerning the coercive tactics used on Walker to secure his statements to police. After Walker informed the State that he intended to call Dr. Leo as a witness at the postconviction hearing, the State moved in limine that the circuit court exclude Dr. Leo’s testimony because, it argued, his testimony would not assist the trier of fact. (C. 1769-77.) The circuit court held a hearing and granted the State’s motion to exclude Dr. Leo’s testimony. (R. 677.) '
Several courts' have addressed the admissibility of testimony from the same expert involved in this case — Dr. Richard A. Leo — and have upheld the exclusion of Dr. Leo’s testimony. Courts in Pennsylvania *301 and Alaska have excluded Dr. Leo’s- testimony after finding that his testimony did not assist the finder of fact. See Commonwealth v. Alicia, 625 Pa. 753, 92 A.3d 753 (2014), and Vent v. State, 67 P.3d 661 (Alaska Ct.App.2003).
The Supreme Court of Pennsylvania in Commonwealth v. Alicia stated:
“Although this Court has not previously ruled on the admissibility of expert testimony concerning false confessions, courts in other jurisdictions have done so. Many have held such testimony inadmissible. For example, in United States v. Benally, 541 F.3d 990, 993 (10th Cir.2008), the Tenth Circuit Court of Appeals upheld.a district court’s refusal to admit a psychologist’s expert testimony concerning whether false confessions occur, and if they do occur, why they occur. The defendant-appellant had testified that his confession was false and claimed that it. had been prompted by federal agents’ coercive tactics. Id. In rejecting the defendant-appellant’s proffered expert testimony, the Tenth Circuit held as follows:
“ ‘[The psychologist’s1' expert] ■ testimony inevitably would encroach upon the jury’s vital and exclusive function to make credibility determinations. While [the defendant-appellant] emphasizes that [the psychologist expert] would not have opined as to whether she believed [that he had] confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the [defendant-appellant’s] testimony that his confession was a lie. Testimony concerning credibility is often excluded because it usurps a critical function of the jury and because it is not helpful to the jury, which is capable of making its own determination regarding credibility.’
“Id. at 995 (internal quotation marks and citations omitted).
“In United States v. Jacques, 784 F.Supp.2d 59, 60 (D.Mass.2011), a district court declined to admit the defendant’s proffered expert testimony concerning the existence of false confessions generally and the features of the defendant’s-specific interrogation that allegedly increased the risk of a false confession. Citing Benally, supra, the court concluded, inter alia, that the proffered expert testimony was contrary to the well-established rule that an expert cannot offer an opinion as to a criminal defendant’s guilt or innocence: ‘An opinion that a defendant’s [confession] is unreliable cannot be logically disconnected from the implicit opinion that the defendant . is, in fact, not guilty.’ Jacques, supra at 285-86 (emphasis in original). See also Brown v. Horell, 644 F.3d 969, 978, 982-83 (9th Cir.2011) (in denying a petition for habeas corpus, upholding the exclusion of expert testimony as to interrogation methods that tend to produce false confessions, where the trial court had concluded that the defendant’s explanation for his allegedly false confession, to wit, a threat of violence against another person, was within the jury’s experience); State v. Free, 351 N.J.Super. 203, 798 A.2d 83, 95-96 (App.Div. 2002) (holding . that the trial court abused its discretion in admitting expert testimony as to false confessions and interrogation techniques because, inter alia, it was not scientifically reliable, it was of no assistance to the jury, and the jury would recognize that coercive methods have the potential for causing a false confession).

ti

*302 “After careful review of relevant opinions from courts of other jurisdictions, as wall as our own precedent, we are not persuaded by the rationale of those courts that have admitted expert psychological/psychiatric testimony regarding the phenomenon of false confessions and police interrogation techniques. Rather, we conclude, in agreement with the Tenth Circuit Court’s decision in Benally, supra at 995, that expert testimony such as the proposed testimony of Dr. [Richard] Leo constitutes an impermissible invasion of the jury’s role as the exclusive arbiter of credibility.”
625 Pa. at 446-47, 92 A.3d at 763-64.
The Alaska Court of Appeals in Veiit v. State stated:
“Alaska Rule of Evidence 702(a) states that:
“ ‘[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.’
“ ‘To be admissible, expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge.’ Pursuant to Rule 702, ‘an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.’ ‘The general test regarding the admissibility of expert testimony is whether the jury can receive “appreciable help” from such testimony.’ One of the purposes of admitting expert testimony is ‘to inform the court and jury about affairs not within the full understanding of the average man.’ ‘When the subject of inquiry is one which common knowledge would enable one to decide, it is not a proper subject for expert testimony. It is for the trial court in the exercise of a sound discretion to determine whether expert testimony is appropriate under the circumstances of the case.’ ”
67 P.3d at 667-68 (footnotes containing citations omitted).
The United States District Court for the Western District of Michigan in United States v. Denman, 892 F.Supp.2d 881 (W.D.Mich.2012), held that testimony concerning false statements was not admissible because that testimony was more prejudicial than probative.' The court stated:
“[T]he Court concludes that even if Dr. [Richard] Leo’s testimony is relevant, it should be excluded because it has minimal probative value but significant potential for unfair prejudice. Pursuant to the Federal Rules of Evidence, a court may exclude relevant evidence ‘if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury....’ Fed.R.Evid. 403. In the Court’s judgment, Dr. Leo’s testimony might be useful to inform the jury about the phenomenon of false confessions. There is no reason to believe that the average juror is familiar with law enforcement interrogation practices, has ever been exposed to such practices, or knows that certain coercive practices have actually led to false confessions. In this regard, this Court agrees with the Michigan Supreme Court’s conclusion in People v. Kowalski, 492 Mich. 106, 821 N.W.2d 14 (2012), that false confession claims are beyond the common knowledge of the average juror and that expert testimony on the subject may be admitted to assist jurors, so long as it meets the other requirements for *303 admissibility. Kowalski, 492 Mich. at 128-30, 821 N.W.2d 14. But, for the reasons stated above, Dr. Leo’s testimony really adds nothing to the case. Defendant did not confess, so there can be no false confession, and there are no facts in the record showing the type of circumstances that could possibly lead to a false confession. On the other hand, the potential for undue prejudice and misleading the jury is significant because the jury may well assign undue weight to Dr. Leo’s testimony in deciding issues of credibility, even though his testimony itself has little to do with the case. In addition, it would be a waste of everyone’s time for Dr. Leo to testify regarding police tactics that in some cases lead to false confessions when those tactics did not occur here.”
United States v. Denman, 892 F.Supp.2d at 890-91.
In Ray v. State, 80 So.3d 965 (Ala.Crim.App.2011), this Court considered whether Ray’s trial counsel was ineffective for failing to present the testimony of an expert on “false confessions.” We stated:
“[0]ur research has located no Alabama case in which this Court or the Alabama Supreme Court has specifically addressed the merits of the use of expert testimony concerning ‘false confessions,’ induced by interrogation techniques.
“ ‘[A]s to the theory of false confessions, defendant has offered no Illinois decisions holding that such opinions are admissible. To be sure, • expert testimony may be received under the helpfulness standard where it involves knowledge or experience that a juror generally lacks. Kimble v. Earle M. Jorgenson Co., 358 Ill.App.3d 400, 409, 294 IlLDec. 402, 830 N;E.2d 814, 823 (2005). However, we do riot find any support for admissibility of false confession evidence in the authorities cited by defendant. See People v. Miller, 173 Ill.2d 167, 186-88, 219 Ill.Dec. 43, 670 N.E,2d 721, 730-31 (1996) (DNA evidence admissible where generally accepted in the relevant scientific community); People v. York, 312 Ill.App.3d 434, 437, 245 Ill.Dec. 227, 727 N.E.2d 674, 677-78 (2000) (counsel ineffective in failing to present exculpatory DNA evidence); People v. Smith, 236 Ill.App.3d 35, 42, 177 Ill. Dec. 492, 603 N.E.2d 562, 566 (1992) (upholding admissibility of child psychologist’s opinion as to victimas truthfulness). We recognize that opinions concerning false confessions have been admitted in other jurisdictions. See United States v. Hall, 93 F.3d 1337, 1345 (7th Cir.1996), aff'd, 165 F.3d 1095 (1999); Miller v. Indiana, 770 N.E.2d 763, 774 (Ind.2002); Boyer v. Florida, 825 So.2d 418, 419 (Fla.App.2002). However, absent a threshold determination that such evidence meets Frye’s general acceptance requirement, we have no position as to the admissibility of such evidence had it been offered. See Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923); In re Simons, 213 Ill.2d 523, 529-30, 290 Ill.Dec. 610, 821 N.E.2d 1184, 1188-89 (2004).’
“People v. Harris, 389 Ill.App.3d 107, 134, 904 N.E.2d 1077, 1099, 328 Ill.Dec. 567, 589 (2009).”
Ray, 80 So.3d at 991-92.
Here, Walker sought to introduce Dr. Leo’s testimony to support his claim that his trial counsel were ineffective for failing to secure the services of an expert in “false confessions.” We decline to find that the circuit court erred in excluding Dr. Leo’s testimony given that that testimony would most likely have been excluded at Walker’s 2003 trial and given our holding in Ray. Accordingly, we find no reversible error.
*304 VIIL
Walker' next argues that the circuit court erred in excluding evidence related to his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), claim. Specifically, Walker asserted in his amended petition that the State failed to disclose that it had • threatened to revoke Byrd’s probation in order to secure his testimony at Walker’s trial. Walker argued that the circuit court erred in excluding the following testimony that occurred during Hogg’s direct examination:'
“Q. [MS. CRISTOVICI, Postconviction counsel]: Ydu mentioned that you had a subsequent meeting with Mr. Byrd. Can you tell me when that happened?
“A. [Hogg]: I believe it was last summer.,
“Q. [MS. CRISTOVICI]: Based on your discussions .with Mr. Byrd — and I’m not asking anything he specifically said — is it your belief that Mr, Byrd was threatened or pressured into testifying at trial?
“MR. GOVAN [Assistant Attorney General]: Objection. The substance of that information—
“THE COURT: Sustained. Mental operation. I.mean, I don’t know what his thought process was at the time. That is, the petitioner.
“MS. CRISTOVICI: I’m sorry. Your Honor?
' “THE .COURT: You’re asking for Walker’s?
“MS. CRISTOVICI: Oh, no. I’m asking for Mr. Hogg’s opinion on the matter. Your Honor.
“THE COURT: On what?
“MS. CRISTOVICI: On whether he believes that Mr. Byrd was either pressured or threatened into testifying at the time of trial,’ based on his discussions with Mr. Byrd. I’m not- asking about anything—
“THE COURT: All right. You’ll have to — you have to lay the foundation for that opinion. I mean, I’ve seen way too many' opinions given, feels this way, feels that way, without just much of a foundation at all.
“MS. CRISTOVICI: Your Honor, the foundation—
“THE COURT: So if he has — has á found — if you lay.that foundation and if it does indeed exist, then he can give an opinion,
“BY MS. CRISTOVICI:
“Q. Did you have discussions with Mr. Byrd after the time of trial regarding, why he testified?
“A. Yes.
“Q. And based on those discussions, what is your understanding of Mr, Byrd’s motive for testifying at Mr. Walker’s trial?
“A. That he—
“MR. GOVAN: That’s going to the ultimate — ultimately they’re going to use that to go to the ultimate issue that that’s here in this proceeding.
“MS. CRISTOVICI: I’m not asking about Mr. Byrd’s statement. I’m asking about what the foundation is for his opinion on Mr. Byrd’s motive. Your Honor.
“THE COURT: And he draws that opinion from what?
“MS. CRISTOVICI: Based on the discussions—
“THE COURT: Mr. Byrd’s statement?
“MS. CRISTOVICI: Well, based on discussions he had with Mr. Byrd.
“THE COURT: Subsequently. ..
“MS. CRISTOVICI: Yes, Your Honor.
*305 “THE COURT: Well, bring Byrd in. Sustained.”
(R. 363-66) (emphasis added).
“Téstimony of a witness as to what others believed is not ádmissible.” Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985). See also McAdams v. State, 378 So.2d 1197 (Ala.Crim.App.1979); and Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967). “A witness may not testify to the uncommunicated intent or mental operation of another ... nor may a witness answer questions calling for ‘the mere reason, conclusion, or opinion of the witness.’ ” Perry v. Brakefield, 534 So.2d 602, 608 (Ala.1988).
“The Alabama Rules of Evidence apply to Rule 32 proceedings.” Hunt v. State, 940 So.2d 1041, 1051 (Ala.Crim.App.2005). Any testimony by Hogg concerning what Byrd told him would be hearsay. “Hearsay” is defined in Rule 801(e), Ala. R. Evid.;' as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Walker attempted to present this testimony to support his -claim that Byrd was pressured to testify. ' Thus, any statements that Byrd made to Hogg would be classic hearsay and inadmissible.
The circuit court did not err in excluding this inadmissible testimony at Walker’s postconviction evidentiary hearing.
IX.
Walker argues that the circuit court erred in summarily dismissing several of his claims before the evidentiary hearing.
A.
First, Walker argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for prematurely raising a claim of ineffective assistance-of counsel in his motion for a new trial. Walker’s entire-argument, in brief, on this issue consists of the following: i;
“The circuit court erroneously dismissed Mr. Walker’s claim that .Decker was constitutionally ineffective for prematurely asserting an ineffective-assistance-of-counsel claim at the motion for new trial as ‘procedurally barred.’ As this claim asserted Decker’s ineffectiveness, and Decker was counsel on direct appeal, it could not have been asserted on direct appeal and was raised for the first time in Mr. Walker’s Rule 32 petition. See Ala. R.Crim. P. 32.(a)(5).”
(Walker’s brief at p. 98.)
In regard to this issue, Walker’s brief fails to comply with the requirements of Rule 28(a)(10), Ala. R.App. P.
“ ‘It is not the job of the appellate courts to do a party’s legal research.... Nor is it the function of the appellate courts to “make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.’” Pileri Ind., Inc. v. Consolidated Ind., Inc., 740 S.o.2d 1108, 1110 (Ala.Civ.App.1999), quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994). Because Jennings has failed to. present sufficient argument, authority, or citation to the facts in support of this issue, we conclude that he has failed to comply with Rule 28(a)(10) and that this issue is; therefore, deémed to be waived.”
Jennings v. State, 965 So.2d 1112, 1136 (Ala.Crim.App.2006). Walker waived this argument on appeal; therefore, it will not be considered. -
B.
Walker next argues that the circuit court erred in dismissing his claim that “the State withheld exculpatory evidence *306 relating to Byrd’s snitching activities in violation of Brady v. Maryland, as procedurally barred.” (Walker’s brief at p. 98.)
The State asserted that this claim was procedurally barred because it could have been raised at trial or on direct' appeal. See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P. On appeal, the State asserts that it was properly deemed procedurally barred because Walker did not allege thát the Brady claim wás based on newly discovered evidence. The circuit court properly determined that this claim was procedurally barred. See Yeomans v. State, [Ms. CR-10-0095, March 29, 2013] — So.3d (Ala.Crim.App.2013); Washington v. State, 95 So.3d 26 (Ala.Crim.App.2012); Ray v. State, 80 So.3d 965 (Ala.Crim.App.2011); and Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008). Walker is due no relief on this claim.
C. ■
Third, Walker argues that the circuit court erred in summarily dismissing his claim that his counsel was ineffective for failing to move for a new trial based on the assertion that the State argued inconsistent theories at Walker’s and Beckworth’s trials. Specifically, he argued that at Beckworth’s trial the State argued that Beckworth was the shooter and that at Walker’s trial the State argued that Walker was the shooter.
In addressing a similar issue, this Court in Johnson v. State, [Ms. CR-05-1805, September 28/2007] — So.3d - (Ala.Crim.App.2007), stated:
“Many courts have recognized that the government may argue inconsistent theories in cases involving multiple defendants. In addressing this issue, federal courts have upheld the State’s presentation of inconsistent evidence in 'codefendants’ trials. The United States Court of Appeals for the Fifth Circuit has stated:
“ ‘[The defendant] argues that his constitutional due process rights were violated when the government presented inconsistent theories at two criminal trials — namely, at Cooper’s [codefendants’] trial the government argued that Cooper shot Marshall, and at [the defendant’s] trial, the government argued that [the defendant] shot Marshall. We have held, though, “a prosecutor can make inconsistent arguments at the separate trials of co-defendants without violating the due process clause.” Beathard v. Johnson, 177 F.3d 340, 348 (5th Cir.1999); see also Nichols v. Scott, 69 F.3d 1255, 1272 (5th Cir.1995) (“Two things, however, may be said about the rather amorphous doctrine of judicial estoppel. First, there is no indication in the authorities that it is constitutionally mandated. Second, it has apparently never been applied against the government in a criminal case.”). In any event, the inconsistencies were immaterial to the conviction since [the defendant] could have been convicted for the same offense, carjacking resulting in death and aiding and abetting the same, under both theories. See United States v. Paul, 217 F.3d 989, 998-99 (8th Cir.2000) (“When it' cannot be determined which of two defendants’ guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution’s argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent.”); cf. Bradshaw v. Stumpf, 545 U.S. 175, 187, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (uphold,ing a guilty plea where the defendant’s assertions of inconsistency related entirely to which individual shot *307 the victim but where “the precise identity of the triggerman was immaterial to [defendant’s conviction for aggravated murder.”).’
“United States v. Frye, 489 F.3d 201, 214 (5th Cir.2007).
“ ‘Courts presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials. See Beathard v. Johnson, 177 F.3d 340, 348 (5th Cir.1999) (“The record does not support such a claim. Price had two live eyewitnesses to the crime, both charged with capital murder and both accusing the other of being the most culpable.... Price, as well as every juror involved, knew that both of the stories could not have been true.”); Parker v. Singletary, 974 F.2d 1562, 1578 (11th Cir.1992) (“But no due process violation occurred, because there was no necessary contradiction between the state’s positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants’ cases to argue alternate theories as to the facts of the murder.”).’
“United States v. Ganadnegro, 854 F.Supp.2d 1088, 1098 (D.N.M.2012).
“Other state courts addressing this issue have reached the same conclusion.
“ ‘[W]e are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State’s case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State’s whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process.’
“Sifrit v. State, 383 Md. 77, 106, 857 A.2d 65, 82 (2004).
“ ‘Courts have ... found no due process violation stemming from inconsistent arguments as to who was the killer in the relatively common circumstance where each defendant can be held equally guilty as an aider and abettor upon the same inconclusive evidence.’
“State v. Poe, 284 Neb. 750, 768, 822 N.W.2d 831, 845 (2012).
“There is no due-process violation when the State argues at one trial that one codefendant shot the victim and at the codefendant’s trial argues that that codefendant shot the victim.
“ “When it cannot be determined which of two defendants’ guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecutor’s argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since [the defendant] could have been convicted of aiding and abetting under either theory, we find no error.’
*308 “United States v. Paul, 217 F.3d 989, 998-99 (8th Cir.2000).
“Thus, because there is' no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed. See, e.g., Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009) (counsel cannot be ineffective for failing to raise a -claim, that has no merit);”
— So.3d at -.
Based on this Court’s decision in Johnson, the substantive claim that the State improperly relied on inconsistent theories in Walker’s and Beckworth’s separate trials had no merit; therefore, counsel was not ineffective for failing to raise this issue on direct appeal,. The circuit court correctly found that because this issue did not entitle Walker to relief it was due to be summarily dismissed pursuant to Rule 32.7(d), Ala. R.Crim. P.
For the forgoing reasons, we affirm the circuit court’s order denying Walker’s postcohviction petition attacking his capital-murder conviction and sentence of death.
AFFIRMED.
WINDOM, P.J., and KELLUM, BURKE, and JOINER, JJ., concur.

. Walker raised other issues concerning this claim in his postconviction petition, but he does not raise those issues in his brief to this Court. “[W]e will address only those issues presented in [Walker’s] brief; the other issues are deemed abandoned.” See Holloway v. State, 971 So.2d 729, 731 (Ala.Crim.App. 2006).

. Tudor did testify at the postconviction evi-dentiary hearing concerning the "good deeds” that Walker had done. However, he did not testify about Byrd’s credibility. Indeed, Tudor testified on cross-examination that he had never met Byrd. (R. 556.)

. " 'When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.'” Ray v. State, 80 So.3d 965, 977 n. 2 (Ala.Crim.App.2011), quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000).

. On appeal, Walker raises no issue concerning his counsel's failure to present Pitts’s testimony. Accordingly, this issue is deemed abandoned on appeal. See Holloway v. State, 971 So.2d 729, 731 (Ala.Crim.App.2006).

. In his amended petition, Walker alleged that Farrar could have testified that Walker was not one of the men he saw in front of his house when it was burglarized.

. The State argued at trial that Thweatt was murdered the evening of January 5, 2000. Because .she lived alone, Thweatt’s body was not discovered until January 10, 2000.

. The record of Walker's trial ■ shows that Crespi originally obtained approval for $10,000 for a mitigation expert, that he filed a second motion for funds for a mitigation expert, and that he was granted approval for an additional $5,000 in funds for that expert.

. This Court may take judicial notice of our previous records. See Hull v. State, 607 So.2d 369 (Ala.Crim.App.1992).

. This issue is addressed in Part IX. C. of this opinion.